UNITED STATES of America, Appellee,

v.

·Jesus Jaime GALVAN a/k/a Jesus Vasquez, Appellant.

No. 91–1239.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1991.

Decided Jan. 14, 1992.

Charles E. Atwell, Kansas City, Mo., argued, for appellant.

Thomas Henry Newton, Kansas City, Mo., argued, for appellee.

Before JOHN R. GIBSON, Circuit Judge, ROSS, Senior Circuit Judge, and LOKEN, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Once again, we are called on to determine the legality of an airport search. A drug enforcement agent's search led to the discovery of cocaine and marijuana inside a suitcase Jesus Jaime Galvan brought to Kansas City on a plane arriving from Las Vegas, Nevada. The district court[1] denied Galvan's motion to suppress this evidence, ruling that Galvan consented to the search of his suitcase. Galvan entered a conditional plea of guilty to the charge of possessing with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) (1988). On appeal, Galvan argues that the district court erred in denying his motion to suppress because he did not freely and voluntarily consent to the search of his suitcase. Galvan further claims that his initial conversation with the agent waws a *Terry* stop[2] for which the agent lacked the requisite reasonable and articulable suspicion. Alternatively, Galvan argues that if the initial encounter was consensual, it escalated into an unjustified *Terry* stop. Galvan also strongly attacks the drug agent's credibility. We conclude that the conversation and search of the luggage were consensual, and the district court did not clearly err in so holding. We affirm the conviction.

After Galvan was indicted, he filed a motion to suppress. Galvan's testimony at the suppression hearing conflicted sharply with that of special agent Carl Hicks of the Drug Enforcement Administration. We will recite the findings of fact of the magistrate judge to whom the suppression hearing was referred for a report and recommendation.

On January 16, 1990, Agent Hicks was watching passengers arrive on America West Flight 359 from Las Vegas because he knew that America West passengers leaving California would typically fly into either Phoenix or Las Vegas and then continue on to Kansas City. He had made ten to fifteen narcotics related arrests from Flight 359 in a four-month period. Hicks noticed a Latin male travelling alone and carrying a black travel bag get off the plane, but paid no attention to him until the man went to the baggage claim area. Hicks saw Galvan walk to the baggage claim area and stand alone, staring directly at the baggage carousel and not shifting his gaze. Hicks continued to watch him and finally walked to Galvan's side, stood about 10 feet away from him, and stared directly at Galvan, trying to get a reaction from Galvan. Galvan did not return Hicks' gaze and continued to stare at the baggage claim carousel. Hicks testified that as bags were coming up the ramp on to the carousel, a gray Samsonite suitcase made a huge thud as it hit the side of the carousel, shaking the entire carousel and attracting the attention of everyone in the terminal. The suitcase went around the carousel to Galvan, who picked it up and walked out of the terminal.

Hicks followed Galvan outside, showed him his badge, and said, "Good morning, sir, I'm a police officer. Could I talk to you for a second?" Galvan agreed to talk to him and told Hicks he had come to Kansas City to visit a friend but that he lived in San Diego. Hicks asked to see Galvan's airplane ticket and Galvan handed him a one-way ticket in the name of Joe Garcia. The ticket had been purchased with cash the previous day through a travel agency. Hicks returned the ticket to Galvan and asked him if he had identification. Galvan opened a plastic folder and Hicks noticed a California driver's license that Galvan attempted to conceal by placing his palm over it. Hicks told him that the California driver's license would be sufficient identification, and Galvan showed him the license, which was in the name of Jesus Vasquez.

---

1. The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

2. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Galvan had no explanation for the difference in names on the ticket and the driver's license other than that was the way the airline did it. When asked if he was sure that the suitcase belonged to him, Galvan replied that "it might not," but after comparing the baggage claim number on the bag with the claim check on the ticket, he said that the bag must be his. Galvan appeared nervous and would not look at Hicks during the conversation.

Hicks then showed Galvan his badge for the second time, told him that he was a DEA agent watching for drugs, and asked Galvan if there were any drugs in the suitcase. Galvan replied, "Not that I know of," and Hicks asked him if he could look in the bag. Galvan agreed. Hicks asked Galvan if he would mind walking back inside the terminal to get out of the way of traffic, and Galvan said that this would be alright with him. Galvan carried the suitcase inside the terminal accompanied by Agent Hicks and Detectives Kessler and Carrill, who had come outside during Hicks' conversation with Galvan, but who had not approached Galvan. The four men walked approximately 100 yards through the terminal to a room.

When they reached the room, Galvan said the suitcase was locked and told Hicks he had the key. Galvan got out a set of American Tourister keys and tried to unlock the suitcase. Hicks told him that the suitcase was a Samsonite, and asked if he had any Samsonite keys. Galvan said that he might, and found a set of Samsonite keys in his pocket and handed them to Hicks. As Agent Hicks started to unlock the suitcase, he asked Galvan if it was okay if he looked inside the suitcase for drugs. Galvan replied, "It's up to you." Hicks stopped, put the keys on top of the suitcase, and told Galvan he did not have to let him search the suitcase and could require Hicks to get a search warrant. Hicks told him if he wanted him to get a search warrant to open the suitcase, Hicks would give him a receipt for it and have him wait at the airport with Kessler and Carrill while he tried to get a warrant. He told Galvan that he believed there were drugs in the suitcase. Hicks then asked Galvan, "Do

you mind if I look into the suitcase for drugs?" Galvan said, "Go ahead." Hicks unlocked the suitcase and recovered approximately one kilogram of cocaine and thirty pounds of marijuana. Hicks then arrested Galvan. After his indictment, Galvan filed a motion to suppress the evidence obtained through Hicks' search of his luggage.

The magistrate judge concluded that the initial contact was a consensual conversation not requiring reasonable suspicion. *United States v. Galvan*, No. 90–00038–01–CR–W–6, slip op. at 8 (W.D.Mo. May 17, 1990). While Galvan testified that he told Hicks he was in a rush to get a taxi and could not talk to him, the magistrate judge found the more credible evidence to be that Galvan initially consented to speak with Hicks. *Id.* The magistrate judge found that Detectives Carrill and Kessler accompanied Hicks and did not participate in or approach Galvan during the interview. *Id.* at 10. The magistrate judge determined that the encounter ceased to be consensual and became an investigative or *Terry* stop when Agent Hicks showed Galvan his badge for the second time, told Galvan that he was with the DEA, and asked Galvan if there were drugs in the suitcase. *Id.* at 10–11. The magistrate judge further found that at that time the *Terry* requirements of reasonable and articulable suspicion had been met. *Id.* at 11. He concluded that under the totality of the circumstances, Galvan voluntarily consented to the search of his suitcase. *Id.* at 13.

Likewise, the district court rejected the attacks of Galvan's counsel on Agent Hicks' credibility and concluded that under the circumstances a consensual search had occurred. *United States v. Galvan*, No. 90–00038–01–CR–W–6, slip op. at 1–3 (W.D.Mo. July 9, 1990). The district court based its ruling only on consent. However, in discussing whether Hicks used trickery in suggesting to Galvan the possibility of obtaining a search warrant, the district court stated that it appeared that probable cause existed at that point to obtain a search warrant. *Id.* at 4.

Galvan thereafter entered a conditional guilty plea, and this appeal followed.

## I.

■■ Galvan contends that Agent Hicks' credibility was severely undermined during the suppression hearing and has also been called into question in at least two of our earlier decisions. The government counters with a list of cases that comment favorably upon Hicks' credibility and capabilities. Little is to be gained by pursuing this inquiry, as the district court determines the issue of credibility. A district court's determinations of credibility demand "great[ ] deference." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). In crediting one of two witnesses, as the district court did here, its finding, if "not contradicted by extrinsic evidence," or "internally inconsistent, can virtually never be clear error." *Id.*

The parties argue about the weight of the luggage, which Agent Hicks said he struggled to bring into the courtroom, but which Galvan's counsel held above his shoulder with one arm. The district court considered this testimony as well as this court's decisions discussing Agent Hicks' conduct in other cases. The district court "generally accepted" Hicks' testimony, although supposing that Hicks initially confused the "thud" from a heavy suitcase with the somewhat lighter impact of the suitcase carrying a large quantity of cocaine. Slip op. at 2. The court found this incident "overshadowed by many indicia that something illicit was being hidden in defendant's luggage." *Id.* Suffice it to say, Galvan has not persuaded us that the district court's credibility findings with respect to Agent Hicks are clearly erroneous.

## II.

■■ Galvan claims that he did not voluntarily consent to a search of his luggage, but merely acquiesced to authority, making the search the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). This court discussed several issues relating to airport stops in *United States v. McKines*, 933 F.2d 1412 (8th Cir.1991) (en banc). In a special concurring opinion joined by seven judges, we stated: "[T]he Supreme Court has explicitly stated that the voluntariness of a person's consent to a search, which involves that person's subjective understanding, is a question of fact to be reviewed under the clearly erroneous standard." *Id.* at 1425 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973)). We therefore reject Galvan's invitation to treat the question of consent as a mixed question of law and fact. The government bears the burden of proving that the defendant freely and voluntarily consented to the search. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983).

We have set forth above in some detail the magistrate judge's findings, which the district court accepted with modifications. These findings demonstrate that the district court did not err in concluding that Galvan freely and voluntarily consented to the search of his luggage. The district court stressed that the entire encounter was noncoercive in nature, and expanded upon the magistrate judge's findings by stating that there are fewer coercive factors present here than in most of the cited cases. Slip op. at 3–4. The district judge pointed to the likelihood that the experienced agent "would probably routinely use the right phrasing." *Id.* at 3. The district court continued:

The sensitivity of Agent Hicks to the need for voluntary consent is shown by his repeatedly seeking assurance and his unwillingness to rely on the acquiescence ambiguously implied in the defendant's words, "It's up to you."

Under the circumstances a consensual search may be found. The case is out of the ordinary in that defendant was clearly alerted to his legal rights and declined to exercise them. He had probably expressed or indicated consent to a search twice before the final consent was given.

*Id.* at 3–4. Although Galvan attacks Hicks credibility, he makes no argument that

these findings of fact are clearly erroneous, as the thrust of his argument is that even if the initial encounter was consensual, it quickly became a *Terry*-stop for which there was no reasonable articulable suspicion. Our study of the record convinces us that the finding of the consensual search is not clearly erroneous, and this alone requires affirmance.

### III.

■ Galvan argues that his initial contact with Hicks was not consensual, but constituted a *Terry* stop for which Agent Hicks had no reasonable and articulable suspicion. *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980); *Terry v. Ohio*, 392 U.S. 1, 20–31, 88 S.Ct. 1868, 1879–1885, 20 L.Ed.2d 889 (1968).

■ A *Terry* stop is a seizure for fourth amendment purposes. *Terry*, 392 U.S. at 16, 88 S.Ct. at 1877. In *McKines*, we held in our special concurrence that the question of whether there has been a seizure "is a legal characterization that must be reviewed de novo." 933 F.2d at 1426. We determine whether a seizure has occurred for fourth amendment purposes by inquiring whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *McKines*, 933 F.2d at 1415 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)).

We conclude that Hicks' initial confrontation with Galvan did not amount to a *Terry* stop. Hicks approached Galvan and asked to talk to him. Galvan voluntarily agreed to produce his plane ticket and driver's license. He continued to voluntarily answer questions about the difference in names on the ticket and the license, and about the ownership of the suitcase. *Terry* recognizes that some encounters between police officers and citizens are voluntary in nature, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16, and the district court did not err in finding that this was such an encounter. *See also United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir.1988); *United*

*States v. Miller*, 835 F.2d 187, 189–90 (8th Cir.1987). Because we hold that the initial encounter was not a *Terry* stop, we need not address whether Agent Hicks had a reasonable, articulable suspicion to approach and question Galvan.

Galvan alternatively contends that, even assuming the initial contact was consensual, the encounter soon escalated into a stop, and that Agent Hicks still had no basis to make such a stop. This argument bears close scrutiny, as the magistrate judge concluded, based upon some of our earlier decisions, that a second showing of the officer's badge converted the encounter into a *Terry* stop. Slip op. at 8–10. (May 17, 1990). *See United States v. Nunley*, 873 F.2d 182, 184 (8th Cir.1989); *United States v. Drinkard*, 900 F.2d 140, 142–43 (8th Cir.1990). In its brief filed before our en banc decision in *McKines*, the government concedes that the encounter ceased to be consensual and became an investigatory stop under *Terry* at this point.

■ We rejected such a bright line rule in our en banc decision in *McKines*, 933 F.2d at 1419. Our study of the record does not cause us to conclude that the encounter between Hicks and Galvan escalated into a *Terry* stop at this point, but little is to be gained by detailed analysis of this issue. In view of the magistrate judge's conclusion and the government's concession, in order to answer Galvan's arguments, we briefly analyze the question of reasonable suspicion, as we are convinced that the record demonstrates that if there was a *Terry* stop, Agent Hicks had reasonable suspicion for such a stop. The test is whether Agent Hicks was aware of " 'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed.' " *Campbell*, 843 F.2d at 1093 (citing *United States v. Martin*, 706 F.2d 263, 265 (8th Cir.1983); *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879). Hicks must have acted "on facts directly relating to the suspect or the suspect's conduct and not just on a 'hunch' or on circumstances which 'describe a very broad category of predominantly innocent

travelers.'" *Campbell*, 843 F.2d at 1093–94 (quoting *Reid v. Georgia*, 448 U.S. at 440–41, 100 S.Ct. at 2754).

When Agent Hicks displayed his badge to Galvan a second time, it was evident to Hicks that Galvan had travelled from San Diego, a known source city for drugs, on a one-way cash purchase ticket which bore the name Joe Garcia, and the driver's license, which he produced after attempting to conceal it, bore the name Jesus Vasquez. Galvan gave no reasonable explanation for the discrepancy in the two names, seemed nervous, and did not look at Hicks as the two talked. While the thud of the luggage onto the carousel may be ambiguous in its significance, the fact that Galvan admitted some tie to the suitcase only after comparing the claim check with the baggage tag, combined with the other factors we have recited above, created reasonable suspicion on the agent's part. Hicks therefore committed no illegality to taint Galvan's consent to a search of his suitcase. Thus, we reject Galvan's argument, as there was reasonable suspicion to support a *Terry* stop at the later point in time. Our discussion in no way detracts from our holding in *McKines* that the second showing of a badge is not sufficient in and of itself to demonstrate that there was a *Terry* stop.

 There is yet a third point in time during this encounter at which we should consider whether a seizure had occurred, although the parties have not raised this possibility. After Galvan had accompanied Hicks and the other officers to the room in the terminal, produced first the American Tourister keys, and then the Samsonite keys, Hicks again asked if it was okay to look inside the suitcase. When Galvan said, "It's up to you," Hicks stopped and put the keys on top of the suitcase. Hicks then told Galvan that if he wanted him to get a search warrant to open the suitcase, Hicks would give Galvan a receipt for it and have him wait at the airport with the other officers while Hicks tried to get the warrant. At this point a reasonable person would have believed that he was not free to leave, and thus there was a *Terry* seizure. *McKines*, 933 F.2d at 1425. What we have

said above analyzing reasonable suspicion is still fully applicable, however. In addition, Galvan's production of the American Tourister keys to unlock the Samsonite suitcase further strengthened the reasonable articulable suspicion. Again, at this later point in time Galvan continued to give his consent, and there was no illegality to taint his consent to the search of the suitcase. Indeed, the district court concluded that there was more than reasonable suspicion, but even probable cause, so as to reject a claim of a coerced search under the analysis of *United States v. Raines*, 536 F.2d 796, 801 (8th Cir.), *cert. denied*, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976).

Having said as much, there is no basis for reversing the district court's finding that Galvan consented to the search, and that there was no illegality in the seizure of Galvan under circumstances amounting to a *Terry* stop, so as to vitiate such consent.

We affirm the district court's order denying the motion to suppress and affirm the conviction.