**UNITED STATES of America, Appellee,**

v.

**Arthur T. WEAVER, Appellant.**

No. 89–2887.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1990.

Decided June 5, 1992.

Rehearing and Rehearing En Banc Denied Aug. 11, 1992.

Susan M. Hunt, Kansas City, Mo., argued, for appellant.

Anita L. Mortimer, Asst. U.S. Atty., Kansas City, Mo., argued, for appellee.

Before Richard S. ARNOLD,* Chief Judge, WOLLMAN, Circuit Judge, and HANSON,** Senior District Judge.

WOLLMAN, Circuit Judge.

Arthur T. Weaver appeals his conviction on a charge of possession of cocaine with intent to distribute, a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). The sole issue before us on appeal is whether the district court[1] erred in denying Weaver's motion to suppress evidence. We affirm.

I.

In the early morning hours of March 8, 1989, Drug Enforcement Administration (DEA) agent Carl Hicks and Platte County Detectives Paul Carrill and Tully Kessler were at the Kansas City International Airport awaiting the arrival of Braniff Flight 650, a direct flight to Kansas City from Los Angeles due in at 6:45 a.m. As Weaver disembarked from Flight 650 he caught Officer Hick's attention because he was a "roughly dressed" young black male who was carrying two bags and walking rapidly, almost running, down the concourse toward a door leading to a taxi stand. Because Hicks was aware that a number of young roughly dressed black males from street gangs in Los Angeles frequently brought cocaine into the Kansas City area and that walking quickly towards a taxicab was a common characteristic of narcotics

---

* The Honorable Richard S. Arnold became Chief Judge of the United States Court of Appeals for the Eighth Circuit on January 7, 1992.

** The Honorable William C. Hanson, United States Senior District Judge for the Southern District of Iowa, sitting by designation.

1. The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

couriers at the airport, he became suspicious that Weaver was a drug trafficker.

Hicks and his fellow officers began running down the concourse after Weaver. Weaver stopped, turned around, saw the three men approaching him, and hesitated. Hicks displayed his badge and asked Weaver if he would answer some questions. In response to Hicks' question, Weaver said that he had been in Los Angeles trying to find his sister who had been missing for several years. Hicks requested to see Weaver's airline ticket, but after searching his pockets Weaver said that he must have left it on the plane. When Hicks asked Weaver if he had any identification, Weaver replied that he did not, but gave Hicks his name and Kansas City address. Hicks testified that while it is extremely uncommon for adults not to have identification, it is common for persons carrying narcotics not to have any. Hicks also testified that Weaver appeared to be very nervous: his voice was unsteady, his speech was rapid, his hands shook, and his body swayed. Officer Carrill testified that although people often become nervous when approached by a police officer, Weaver exhibited more nervousness than innocent people usually do.

Hicks again displayed his badge, identified himself as a DEA agent looking for drugs, and asked to search Weaver's bags. After telling Hicks that he did not have any drugs, Weaver initially assented to Hicks' searching his bags, but then changed his mind and told Hicks that he could not search the bags without a warrant. Weaver then said that he needed to catch a taxi to see his mother in the hospital, picked up his bags, and walked out of the terminal towards a taxicab.

Hicks decided at this point to detain Weaver's bags and apply for a search warrant. He and the other officers followed Weaver to the sidewalk outside the terminal, where Hicks told Weaver that he was going to detain his bags and attempt to get a search warrant. Weaver stopped, set down the bags, opened one of them and removed a sweater, saying, "[L]ook, there's no drugs in my bag," but would not let Hicks look in the bag. Weaver again picked up the bags and walked toward a taxi.

Hicks followed Weaver and again told him that he was going to seize his bags and attempt to get a search warrant. Hicks told Weaver that he was free to remove anything he needed in order to continue his trip. Weaver said he needed a coat out of the bag. Hicks told him that that was fine and that he would give Weaver a receipt for the bag. Nevertheless, Weaver got into the back seat of a taxi with both bags. Hicks grabbed one of the bags and tried to take it out of the taxi. When Weaver began hitting Hicks' hand in an attempt to pry it off his bag, Hicks placed him under arrest.

The officers then conducted a pat down search on Weaver. They found a plastic bag filled with crack cocaine and a smoking pipe, along with $2,532 in currency. Hicks obtained a warrant and searched both of Weaver's bags. One of the bags contained more than six pounds of crack cocaine.

Weaver moved to suppress all physical evidence obtained from his person and baggage. Following a hearing, the district court denied the motion. Weaver entered a conditional guilty plea, reserving the right to appeal the denial of the suppression motion. The district court sentenced Weaver to 151 months' imprisonment, supervised release of five years, a fine of ten thousand dollars, and a special assessment. This appeal followed.

## II.

Weaver contends that the law enforcement officers did not have a reasonable, articulable suspicion of criminal activity and thus violated his Fourth Amendment right to be free from unreasonable searches and seizures.

Police may, without a warrant, briefly stop and ask questions of a person whom they reasonably suspect of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 20–23, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968). Detention of a person's luggage in an airport must satisfy the same *Terry*

standards. *United States v. Place*, 462 U.S. 696, 708, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983); *United States v. White*, 890 F.2d 1413, 1416 (8th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990). Reasonable suspicion must derive from more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. For a *Terry* stop to be valid, the police must point to particular facts and inferences rationally drawn from those facts that, when viewed under the totality of the circumstances and in light of the officer's experience, create a reasonable suspicion of criminal activity. *United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989); *United States v. Crawford*, 891 F.2d 680, 681 (8th Cir.1989). "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Sokolow*, 490 U.S. at 10, 109 S.Ct. at 1587 (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983)). Thus, a series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together. *Id.* "[C]onduct typical of a broad category of innocent people provides a weak basis for suspicion." *Crawford*, 891 F.2d at 681; *see also Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam).

■ Because Weaver felt free to leave when the officers first questioned him, that encounter was consensual and did not constitute a seizure. *Florida v. Royer*, 460 U.S. 491, 497–508, 103 S.Ct. 1319, 1323–30, 75 L.Ed.2d 229 (1983) (plurality). It was only when Hicks told Weaver that he intended to seize Weaver's bags that a seizure for Fourth Amendment purposes occurred. *United States v. Harvey*, 946 F.2d 1375, 1377 (8th Cir.1991); *United States v. McKines*, 933 F.2d 1412, 1423 (8th Cir.) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991). *See also United States v. Galvan*, 953 F.2d 1098, 1102–03 (8th Cir.1992). Our decision therefore turns on whether the officers had a reasonable, articulable suspicion that Weaver was engaged in criminal activity when they pursued him to detain his baggage after he attempted to leave.

■ Hicks testified that he took the following factors into consideration when he decided to detain Weaver's bags: (1) that Weaver got off a direct flight from Los Angeles, a source city for drugs; (2) that he was a roughly dressed young black male who might be a member of a Los Angeles street gang that had been bringing narcotics into the Kansas City area; (3) that he moved rapidly from the airplane toward a taxicab; (4) that he had two carry-on bags and no checked luggage; (5) that he had no identification on his person; (6) that he did not have a copy of his ticket; (7) that he appeared very nervous when he talked to Hicks; (8) and that he made no mention of visiting his mother until the last second before he tried to leave the consensual interview.[2]

---

2. Regarding the matter of race, Hicks testified that several different factors caused him to suspect that Weaver might be carrying drugs: "Number one, we have intelligence information and also past arrest history on two black—all black street gangs from Los Angeles called the Crips and the Bloods. They are notorious for transporting cocaine into the Kansas City area from Los Angeles for sale. Most of them are young, roughly dressed male blacks."

We agree with the dissent that large groups of our citizens should not be regarded by law enforcement officers as presumptively criminal based upon their race. We would not hesitate to hold that a solely race-based suspicion of drug courier status would not pass constitutional muster. Accordingly, had Hicks relied solely upon the fact of Weaver's race as a basis for his suspicions, we would have a different case before us. As it is, however, facts are not to be ignored simply because they may be unpleasant—and the unpleasant fact in this case is that Hicks had knowledge, based upon his own experience and upon the intelligence reports he had received from the Los Angeles authorities, that young male members of black Los Angeles gangs were flooding the Kansas City area with cocaine. To that extent, then, race, when coupled with the other factors Hicks relied upon, was a factor in the decision to approach and ultimately detain Weaver. We wish it were otherwise, but we take the facts as they are presented to us, not as we would like them to be.

In *Reid v. Georgia*, the Supreme Court concluded that a drug agent could not, as a matter of law, have reasonably suspected the defendant of criminal activity by relying on the following factors: (1) the defendant's arrival from a source city for cocaine; (2) the defendant's arrival early in the morning when "law enforcement activity is diminished;" (3) the defendant and his companion had no luggage other than shoulder bags; and (4) the apparent attempt of the defendant and his companion to conceal the fact that they were traveling together. 448 U.S. at 441, 100 S.Ct. at 2754.

In *United States v. Sokolow*, the Court held that agents had a reasonable basis on which to suspect that the defendant was transporting illegal drugs where: (1) the defendant had paid more than $2,000 for two airline tickets in cash; (2) he traveled under a name which did not match the name listed for his telephone number; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours; (5) he appeared nervous; and (6) he checked none of his luggage. Although "[a]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel[,] ... together they amount to reasonable suspicion." 490 U.S. at 8–9, 109 S.Ct. at 1586.

In *United States v. Nunley*, 873 F.2d 182 (8th Cir.1989), we found that an investigative stop was justified where the defendant had purchased a one-way ticket with cash a few minutes before departure, traveled without baggage, exhibited a "nervous state," and had moved erratically through the airport as if she was waiting to meet someone or seeking to evade the authorities. *Id.* at 185.

In *United States v. White*, 890 F.2d 1413, 1418 (8th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990), we expressed our concern that "[t]he characteristics to which officers ... attach significance in defense of narcotics-related airport stops are disconcertingly interchangeable." We also noted in *White* that nervousness is not an uncommon reaction "when one is confronted by officers of the law." *Id.*

In *White*, we found that the drug agents lacked the reasonable suspicion necessary to justify detention of White's luggage where they relied in part on White's conformity to several characteristics in a drug courier profile: he was traveling from a source city, he arrived early in the morning, the flight he was on had previously yielded arrests of narcotics traffickers, and he had purchased a one-way ticket with cash. *Id.* at 1417. In addition, White appeared very nervous because of the manner in which he closely held his carry-on bag, walked through the airport, and talked to the drug officers. *Id.* Although acknowledging that the factors created a very close case, we noted that only the fact that White had purchased his airline ticket with cash set the case apart from *Reid*.

In *United States v. Harvey*, still another Agent Hicks case, we held that Hicks had reasonable articulable suspicion that Harvey had drugs in his bag based on the following facts: Harvey and two companions arrived at the Kansas City International Airport at 5:05 a.m. on a flight from Los Angeles; Hicks thought that Harvey and his companions resembled Los Angeles gang members and looked like they were scanning the airport for police officers; Harvey immediately ran back inside to the baggage claim area when Hicks began questioning one of the three outside the terminal; Harvey produced a one-way ticket, purchased with cash, issued in the name of J. Murdock and bearing no attached baggage-claim check. Harvey could produce no identification when asked to do so, and his hands began to shake. In response to Hicks' questions, Harvey said that he had checked baggage and was traveling alone. 946 F.2d at 1377.

In *United States v. Galvan*, we were presented with still another of Agent Hicks' drug searches at the Kansas City airport. In response to Hicks' request, Galvan, who said that he lived in San Diego, a known source city for drugs, produced his ticket, which was a one-way ticket purchased for cash and issued in the name

of Joe Garcia. In response to Hicks' request for identification, Galvan opened a plastic folder that contained a California driver's license, which Galvan attempted to conceal by placing his palm over it. Upon being told that the license would be sufficient identification, Galvan showed Hicks the license, which was in the name of Jesus Vasquez. Galvan's only explanation for the discrepancy between the names on the ticket and on the license was that that was the way the airline did it. When asked whether he was sure that the suitcase he had claimed belonged to him, Galvan replied that "it might not"; after comparing the baggage claim number on the bag with the claim check on the ticket, however, he acknowledged that the bag must be his. Galvan appeared nervous and would not look at Hicks during the conversation. 953 F.2d at 1099–1100. We held that these facts, when considered together, created a reasonable suspicion on Agent Hicks' part. *Id.* at 1103. *See also United States v. Martin,* 960 F.2d 59 (8th Cir.1992).

Likewise, we conclude that the facts known to Agent Hicks in the present case gave him reasonable, articulable suspicion that Weaver was carrying drugs. Without recounting all of the facts set forth earlier in this opinion, we note that Weaver's rapid mode of walking towards the taxi stand was characteristic of deplaning drug couriers. Weaver lacked a copy of his plane ticket. His lack of identification, uncommon in the case of most adults, was known to Hicks to be common for drug couriers. Weaver's nervousness, as manifested by his unsteady, rapid speech, his tremulous hands, and his swaying body, struck the officers as exceeding that exhibited by non-drug-carrying passengers.

It is true that some or all of the facts relied upon by Agent Hicks could, and might when viewed by those having no experience in surveiling and apprehending drug couriers, be viewed as innocent, non-suspicion-raising details. Indeed, when juxtaposed against each other, the facts in similar cases can be made to appear wildly inconsistent and contradictory. *See, e.g.,*

the compilation of cases in *United States v. Hooper,* 935 F.2d 484, 499–500 (2nd Cir.) (Pratt, J., dissenting), *cert. denied,* —— U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991). Nevertheless, we must review these cases one at a time and on their particular facts. Having done so here, we conclude that Agent Hicks possessed a reasonable, articulable suspicion that Weaver was carrying drugs, and we therefore affirm the order denying the motion to suppress.

The judgment of conviction is affirmed.

ARNOLD, Chief Judge, dissenting.

Because this case seems to me indistinguishable in any significant way from *United States v. White,* 890 F.2d 1413 (8th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990), I respectfully dissent.

The *White* opinion is less than three years old, and none of our cases decided since that time has questioned it or thrown doubt upon it in any way. There are differences between the present facts and those in *White,* to be sure, as there always are, but the differences, on balance, do not place this search and seizure appreciably closer to the line of legality than what happened in *White.* Like Weaver, White was "very nervous," *ante* at 395, he arrived from a source city, the flight was early in the morning, and White had no checked luggage. Some of the facts in *White,* indeed, appear stronger than the present case: for example, White had purchased his ticket with cash, and it was a one-way ticket. The agents did not know whether Weaver had bought his ticket for cash or not, or whether it was one way. Weaver did not have a copy of his ticket, but sometimes innocent people lose their tickets, to say nothing of ticket coupons which may be of no further use to them. I have lost tickets myself. Weaver had no identification, or at least declined to produce any, but this was his undoubted right: we have not yet come to the point in this country (except maybe in airports) when

citizens must identify themselves to public employees.

One of the most disturbing aspects of this case is the agents' reference to Weaver as "a roughly dressed young black male," *ante* at 394. Most young people on airplanes are roughly dressed, or at least they look that way to one of my age and stage. (This could be said of older people, too, I suspect.) And large numbers of travelers carry two or even three bags on planes with them, apparently mistrusting the airlines' baggage service.

About the only thing left is the officers' testimony that Weaver appeared to be more nervous than innocent passengers. I do not question the officers' sincerity, but it seems unwise to place much weight on such a subjective factor, one that can be wheeled out for use in almost every airport-stop case. The predicate of this assertion must be that Agent Hicks and his colleagues have questioned many passengers, some of whom are innocent, enough passengers, in fact, to be able to vouchsafe an expert opinion on the relative nervousness of drug-carrying passengers as opposed to law-abiding ones. It would be interesting to know how many innocent people have been stopped, either for questioning alone, or for search of their luggage. This information, which we never seem to get in these cases, would go far towards enabling us to say whether the kind of police tactic we have before us is reasonable, which is, after all, the controlling criterion in applying the Fourth Amendment.

Finally, a word about the reliance placed on Weaver's race. This factor is repeated several times in the Court's opinion. I am not prepared to say that it could never be relevant. If, for example, we had evidence that young blacks in Los Angeles were more prone to drug offenses than young whites, the fact that a young person is black might be of some significance, though even then it would be dangerous to give it much weight. I do not know of any such evidence. Use of race as a factor simply reinforces the kind of stereotyping that lies behind drug-courier profiles. When public officials begin to regard large groups of citizens as presumptively criminal, this country is in a perilous situation indeed.

Airports are on the verge of becoming war zones, where anyone is liable to be stopped, questioned, and even searched merely on the basis of the on-the-spot exercise of discretion by police officers. The liberty of the citizen, in my view, is seriously threatened by this practice. The sanctity of private property, a precious human right, is endangered. It's hard to work up much sympathy for Weaver. He's getting what he deserves, in a sense. What is missing here, though, is an awareness that law enforcement is a broad concept. It includes enforcement of the Bill of Rights, as well as enforcement of criminal statutes. Cases in which innocent travelers are stopped and impeded in their lawful activities don't come to court. They go on their way, too busy to bring a lawsuit against the officious agents who have detained them. If the Fourth Amendment is to be enforced, therefore, it must be by way of motions to suppress in cases like this. What we get, instead, as the Court acknowledges, *ante* at 396, is case after case upholding searches and seizures on "facts [that] ... can be made to appear wildly inconsistent and contradictory." Of course we must review each case one at a time and on its particular facts, but we do so against a pattern of precedent. Here, *White* seems to me controlling.

I respectfully dissent.