UNITED STATES of America, Plaintiff,

v.

Felipe MENDEZ, Jr., Defendant.

No. 4:04–CR–199.

United States District Court, S.D. Iowa.

Dec. 23, 2004.

John S. Courter, United States Attorney, Des Moines, IA, for Plaintiff.

Timothy Francis McCarthy, II, McCarthy & Hamrock PC, West Des Moines, IA,

Timothy S. Ross–Boon, Federal Public Defender's Office, Des Moines, IA, Peter W. Berger, Berger Law Firm PC, Robert G. Rehkemper, Berger & Gajdel PC, Urbandale, IA, F. Montgomery Brown, Cook & Brown, PLC, Clive, Eric Kenyatta Parrish, Parrish Kruidenier Moss Dunn, Boles Gribble & Cook LLP, Des Moines, IA, for Defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

PRATT, District Judge.

Before the Court is a Motion to Suppress Evidence filed by the Defendant, Felipe Mendez, Jr., on August 9, 2004. Clerk's No. 35. Also filed on the Defendant's behalf are a Supplemental Motion to Suppress and an Amended Motion to Suppress. Clerk's Nos. 76 and 88. On August 10, 2004 a Grand Jury, convened in the Southern District of Iowa, delivered a one-count Indictment as to this Defendant charging him with Conspiracy to Distribute Methamphetamine under 21 U.S.C. sections 846 and 841(b)(1)(A). Clerk's No. 1. Subsequently, on September 15, 2004, the Government filed a Superseding Indictment reflecting a change in the alleged starting date of the conspiracy. Clerk's No. 41.

The Government filed a timely Resistance to Defendant's motion (Clerk's No. 42) and Memorandum in Support. Clerk's No. 78. At hearing on December 14, 2004, the Court received into evidence the Application for a Search Warrant and the testimony of Steven DeJoode, Special Agent with the Iowa Department of Safety, Division of Narcotics and Enforcement ("Agent DeJoode"). The matter is fully submitted.

## I. BACKGROUND

Mr. Parrish: "Well, following up on my question, do you believe that based on your investigation that you had reasonable suspicion to stop any Hispanic male you saw leaving the residence?"

Agent DeJoode: "Yes. Another Hispanic male hypothetically would have departed the residence, I would have taken the same actions."

Hr'g Tr. at 57.[1]

On July 2, 2004, Agent DeJoode applied for and obtained a search warrant, in Iowa state court, for a residence shared by Kathleen Boatwright ("Boatwright") and Cody John Cannon ("Cannon"), alleged co-conspirators with the Defendant. Hr'g. Tr. at 8–9; Superseding Indictment. Agent DeJoode had begun an investigation of Boatwright and Cannon on or about June 9, 2004. Hr'g Tr. at 9, 35; Warrant App. at 6. At the time, Agent DeJoode met with a cooperating individual ("CI–1"), who informed Agent DeJoode that methamphetamine could be purchased from Boatwright. Hr'g Tr. at 35. On June 22, 2004, and then again on June 30, 2004 Agent DeJoode orchestrated methamphetamine purchases from Boatwright and Cannon in proximity to their residence ("Residence"). *Id.* at 9, 35–36; Warrant Aff. at 6. During his investigation, Agent DeJoode conducted surveillance by driving by the Residence in order to obtain license plate numbers of visitors at the Residence. Hr'g Tr. at 9. CI–1 told Agent DeJoode that Boatwright had a "Hispanic methamphetamine source from California," and that Boatwright often made trips to California to procure methamphetamine. *Id.* at 35. CI–1 also told Agent DeJoode that Boatwright would fly to California and return to Iowa with her "source" in two separate vehicles. *Id.* During Agent DeJoode's reg-

---

1. The hearing citations refer to the Court's RealTime unedited transcript.

ular surveillance of the Residence prior to July 8, 2004, he observed no Hispanic males in the area around the Residence. *Id.* at 56.

On July 1, 2004, a second cooperating individual ("CI-2") informed Agent De-Joode that methamphetamine could also be purchased from Cannon. *Id.* at 37; Warrant Aff. at 7. On the same date, Cannon met with CI-2 to sell methamphetamine and lamented about only being able to deliver one quarter ounce of methamphetamine instead of the agreed upon amount of one ounce. *Id.;* Warrant Aff. at 7. Cannon then informed CI-2 that more methamphetamine would soon be available because "he would be receiving a large shipment of methamphetamine from a Hispanic male from California." Hr'g Tr. at 37. Later on July 1, 2004, CI-1 told Agent DeJoode that Boatwright had purchased a suitcase and told CI-1 she would be making another trip to California. *Id.* at 37–38. On July 2, 2004, Agent DeJoode obtained the search warrant. *Id.* at 38. The search warrant affidavit contained no mention of the Defendant, the passenger in the car the Defendant was driving, or any reference to Hispanic males. *Id.* at 12. The affidavit likewise contained no description of the vehicle the Defendant was driving, a red Volkswagen Jetta. *Id.*

On July 8, 2004, CI-1 told Agent De-joode that Boatwright had returned to Des Moines. *Id.* at 38. In addition, on that same day, CI-1 told Agent DeJoode "that there was a Hispanic male at the house who the informant believed was the California source of the methamphetamine." *Id.* at 39. Later on July 8, under De-Joode's direction, CI-1 telephoned Boat-wright and, in a recorded conversation, asked whether Boatwright had any meth-amphetamine. *Id.* Boatwright informed CI-1 that she did and agreed to meet with CI-1 for the purpose of selling the meth-

amphetamine. *Id.* On July 8, 2004, Agent DeJoode, along with two other law enforcement personnel, Detective Sean Wissing ("Det.Wissing") and Detective Curtis Pote ("Det.Pote") decided to execute the search warrant on the Residence at 5:05 p.m. *Id.* at 15.

As they approached the Residence at around 3:45 p.m., Det. Wissing noticed a red Volkswagen Jetta ("Jetta") in the driveway of the Residence. *Id.* at 15–16. As he drove by the front of the Residence, Agent DeJoode also noticed a Hispanic male sitting on the porch. *Id.* at 40. A short while later, Detective Wissing observed two Hispanic males get into the Jetta and drive away. *Id.* at 16–17, 41. As to the Jetta or the two persons inside, Detective Wissing observed no illegal or suspicious activity. *Id.* at 17. Agent De-joode, along with Det. Wissing and Det. Pote, each in separate unmarked cars, followed the Jetta. *Id.* The law enforcement officers followed the Jetta for several city blocks. *Id.* at 18. They observed that the driver of the Jetta did not violate any traffic laws. *Id.* Agent DeJoode had no reason to believe the two occupants of the Jetta knew about the impending execution of the search warrant and, thus, no reason to believe they were running from law enforcement. *Id.* Notwithstanding the lack of any observable traffic violation or other illegal activity, Agent DeJoode decided to stop the Jetta at approximately 3:50 p.m. *Id.* at 18–19, 41. Agent DeJoode believed reasonable suspicion existed based on "previous information that [a] Hispanic male from California was involved." *Id.* at 41; *see also id.* at 57 (Agent DeJoode believed reasonable suspicion existed to justify the seizure of *any* Hispanic male leaving the Residence on July 8 or anytime thereafter) (see quote *supra*).

Once stopped, Agent DeJoode approached the Jetta and asked for identification. *Id.* at 20. The Defendant, who was driving, produced a California identification card with the Defendant's picture and the name "Anthony Gonzales." *Id.* at 21, 42. The Defendant told Agent DeJoode the identification card belonged to his brother and then produced a California driver's license. *Id.* at 21, 42–43. The driver's license also contained a photograph of the Defendant, but with the name "Felipe Mendez." *Id.* at 43. The Jetta, with valid registration plates, was registered to two Des Moines residents. *Id.* The Defendant asked Agent DeJoode what was happening and Agent DeJoode responded by informing the Defendant he was conducting an investigation. *Id.* at 26. After some questioning, the Defendant told Agent DeJoode he had just left Cannon's Residence and that he had arrived in Des Moines the previous day, July 7, 2004. *Id.* at 44. A criminal history and social security background check revealed that the Defendant had a significant criminal history in California and that the social security number on the Defendant's identification documents had last been issued prior to the Defendant's date of birth. *Id.* At that point, Agent DeJoode decided to enlist the help of the Bureau of Immigration and Customs Enforcement ("BICE"). *Id.* at 47.

The record is not entirely clear, but Agent DeJoode also searched the Defendant at some time during the stop. *Id.* at 21. The search produced $2,273 in cash and three cellular phones. *Id.* Agent DeJoode documented the phone information saved on each of the phones, e.g., phone book information, outgoing call numbers, incoming call numbers, etc. *Id.* at 22. Also seized was the Defendant's wallet containing photographs, identifications, credit bank cards, and notes. *Id.* at 22–23.

At some time during the stop, Agent DeJoode asked the Defendant to join him in Agent DeJoode's car. *Id.* at 26. Agent DeJoode asked the Defendant whether he would be willing to travel to a different location to conduct the investigation further with the assistance of an interpreter. Agent DeJoode also asked for the Defendant's consent to move the Jetta by allowing one of the officers to drive it, in order to avoid it being towed away. *Id.* at 31, 48–49. With or without the Defendant's consent, Agent DeJoode intended to conduct the investigation at the nearby Iowa State Patrol District One Headquarters in Des Moines ("State Patrol Headquarters"), because Agent DeJoode believed there was sufficient probable cause to justify an arrest for the possession of fraudulent documents. *Id.* at 32–33, 50–51. At approximately 4:20 p.m., Agent DeJoode and other officers arrived at the State Patrol Headquarters with the Defendant, his passenger, and the Jetta. *Id.* at 30. The Defendant was eventually arrested for carrying fraudulent documents. *Id.* at 31. The Defendant and passenger were then taken to the BICE office in the Des Moines federal building and, after an investigation, a federal detainer was lodged against the Defendant and the passenger. *Id.* at 53. The Defendant admitted to immigration officials that he was in the country illegally. *Id.* Subsequently, the Defendant was charged under Iowa law for distribution of methamphetamine. *Id.*

The Jetta was inventoried. *Id.* at 24, 54–55. A search of the Jetta produced two duffle bags containing men's clothing and toiletries. *Id.* at 24. One of the bags also contained $4,800 cash, $740 of which matched preserialized currency used by Agent DeJoode in two prior methamphetamine transactions. *Id.* at 24–25. Agent DeJoode also discovered two black suitcases, one large and one small, and another yellow duffel bag. *Id.* at 25.

## II. ANALYSIS

### A. *The Automobile Stop*

■ Through his original motion to suppress and his supplemental motion to suppress, the Defendant argues that the Government agents had no reasonable basis for stopping the Jetta. Of course, if the stop was unreasonable, as Defendant contends, then the subsequent pat-down of the Defendant, search of the automobile, and arrest would necessarily be invalidated.

■ "An automobile stop is subject to the Fourth Amendment imperative that the stop must be reasonable." *See United States v. Ramos–Caraballo,* 375 F.3d 797, 800 (8th Cir.2004) (citing *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). "A vehicle stop is reasonable if it is supported by either probable cause to believe that a traffic violation has occurred, or an articulable and reasonable suspicion that criminal activity is afoot." *See Ramos–Caraballo,* 375 F.3d at 800–801 (citing *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). "A stop is permissible only when officers are aware of facts which, taken together with rational inferences from these facts, reasonably warrant the suspicion that the person stopped has been, is, or is about to be engaged in criminal activity." *United States v. Rose,* 731 F.2d 1337, 1342 (8th Cir.1984).

■ Although, the investigation into whether reasonable suspicion exists "requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *See Illinois v. Wardlow,* 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (stating that an "officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch of criminal activity'") (citing *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also United States v. Lebrun,* 261 F.3d 731, 733 (8th Cir.2001) (considering significant that a court consider the "view [of] the totality of the circumstances through the perspective of an experienced law enforcement officer trained in crime detection and acquainted with the behavior of criminals"). " 'The relevant inquiry' concerning the inferences and conclusions a court draws [in making a reasonable suspicion determination] 'is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts.' " *See Wardlow,* 528 U.S. at 128, 120 S.Ct. 673 (citing *United States v. Sokolow,* 490 U.S. 1, 10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)) (Stevens, J., concurring in part and dissenting in part).

The Government concedes that no probable cause existed based on a traffic violation, and that no probable cause existed under the search warrant, to stop the Defendant. Instead, the Government contends reasonable suspicion existed to believe the persons in the Jetta were involved in criminal activity. Over the course of questioning at hearing, Agent DeJoode articulated six factors to support a reasonable suspicion that the Defendant was connected to criminal activity, thereby justifying the traffic stop: 1) Boatwright purchased drugs from a Hispanic source in California; 2) the Hispanic source regularly traveled back to Iowa with Boatwright after those purchases; 3) Boatwright had just returned from California after a drug purchase; 4) a month-long surveillance revealed no other Hispanic persons in the vicinity of the Residence over that time period; 5) at least one Hispanic male was in the Residence the day after Boatwright returned from California; and 6) Agent DeJoode believed that person was, in fact, Boat-

wright's Hispanic methamphetamine source from California.

At first impression, it appears the specter of racial profiling casts its shadow over most of the information articulated by Agent DeJoode. If race were the only factor at play in deciding whether to stop the Jetta, then this analysis would proceed no further. *See United States v. Weaver,* 966 F.2d 391, 394 n. 2 (8th Cir.1992) (agreeing with the dissent "that large groups of our citizens should not be presumptively criminal based upon their race"). In *Weaver,* the race of two Los Angeles gangs known to be flooding the Kansas City area with cocaine was deemed a legitimate factor in deciding whether to stop and interrogate a traveler at the airport. *See id.* (stating that, given the other facts taken into account with the defendant's race, the "facts are not to be ignored simply because they may be unpleasant—and the unpleasant fact in this case is that [the officer] has knowledge, based upon his own experience and the intelligence of others that young male member of black Los Angeles gangs were flooding the Kansas City area with cocaine"). A view to the totality of the circumstances, in this case, reflects that the Defendant's race was one of several factors, that taken together with the other information available to Agent DeJoode, made the decision to stop the Jetta a reasonable one.

The existence of the search warrant confirmed that on-going criminal activity likely existed at the Residence. The key issue, for this analysis, is whether the Defendant could reasonably be linked to that activity given Agent DeJoode's information at the time. If so, stopping the Defendant has as he drove away from the Residence was reasonable. *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (basing an analysis of a reasonable or founded suspicion on "the totality of the circumstances—the whole picture"). At hearing, Agent DeJoode testified that CI–1 believed the Hispanic person in the Residence was the methamphetamine source for Boatwright. It is this information, relayed by CI–1 to Agent DeJoode on the day of the warrant execution, that specifically tied the Hispanic male in the Residence to the on-going criminal activity that formed the basis for the search warrant. With no evidence of any other Hispanic person entering or leaving the Residence after he received that information, or that other Hispanic persons frequented the area near the Residence, Agent DeJoode was justified in his suspicion, based on the totality of the circumstances, that the Hispanic persons leaving the house were tied to the criminal activity inside. *See Terry,* 392 U.S. at 21, 88 S.Ct. 1868 (stating that "in making [the] assessment, it is imperative that the facts be judged [by a court] against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief that the action taken was appropriate?'") (quoting *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

The Defendant makes no objection to the source of information to Agent DeJoode—the cooperating individuals, CI–1 and CI–2. Because CI–1's information, in particular, was crucial to establishing reasonable suspicion in this case, however, an analysis regarding the credibility of CI–1 is warranted. The credibility of CI–1 is based on "evidence of the informant's reliability, veracity, and basis of knowledge ...." *See United States v. Ketzeback,* 358 F.3d 987, 991 (8th Cir. 2004) (stating, however, that credibility is not an "independent requirement to be rigidly exacted in every case") (internal

quotations omitted). Compared to the description of the CI in *Ketzeback*, there is scant background provided in this case as to CI-1. The search warrant application, however, does contain a stock informant reliability check-list entitled "Informant Attachment." Warrant App. at 12. The application also revealed that CI-1 provided independently corroborated information, had not given false information in the past, and that CI-1's information was based on personal knowledge. *Id.* Moreover, CI-1 played a key supporting role in Agent DeJoode's investigation, including identifying Boatwright as a drug source, participating in the drug transactions with her, identifying Cannon as another drug source, and participating in recorded telephone calls with Boatwright at Agent DeJoode's direction. *Id.* at 6–7. There is no indication in the warrant affidavit, nor does the Defendant provide evidence, that CI-1 misled law enforcement officials, or was acting from questionable motives. *See Ketzeback*, 358 F.3d at 991–992 (stating that "independent corroboration of even innocuous facts makes it more likely an informant is telling the truth about incriminating ones, and corroboration of innocent behavior can provide the basis for establishing probable cause"). In this case, as observed, Agent DeJoode required mere reasonable suspicion, not probable cause, to believe the Hispanic male in the Residence was Boatright's drug source. Accordingly, reliance on CI-1's information that the person in the Residence just prior to the execution of the search warrant was Boatwright's Hispanic drug source from California, is justified.

In drawing this conclusion, the Court is cognizant of the often difficult relationship between minority groups and law enforcement officials. *See Wardlow*, 528 U.S. at 133 n. 9, 120 S.Ct. 673 (citing, at length, several studies and views revealing the perspective of minority groups, including the Chief of the Washington, D.C., Metropolitan Police Department: "[S]izeable percentages of Americans today—especially Americans of colorstill view policing in the United States to be discriminatory, if not by policy and definition, certainly in its day to day application.") (Stevens, J. concurring in part and dissenting in part). Because the standard to support reasonable suspicion is, compared to other standards governing consideration of evidence, exceedingly low, Agent DeJoode's actions pass constitutional muster. That said, the Court is troubled that up until his actual identification was secured, the Defendant was only identified as being part of a racial minority and stopped largely because of that generalized identification. As did the Supreme Court in *Terry*, this Court recognizes that the relationship between law enforcement officials and the citizenry is made up of numerous and diverse encounters. In this case, the law enforcement officials could only decide and act on the information available to them. *See Weaver*, 966 F.2d at 394 n. 2 (discussing race as a factor in drug-related cases and though wishing otherwise, stating "we take the facts as they are presented to us, not as we would like them to be"). It is this Court's hope, however, that the Government continues to sensitize its agents to the perceptions of the minority communities it serves, and bear in mind identifications based on generalized racial groupings in support of searches and seizures risk undermining the support that is so crucial to good police work. *See Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandies, J., dissenting) ("Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.").

### B. *Patdown, Search, and Arrest*

After the valid traffic stop, Agent DeJoode asked for identification. *See United States v. Ortiz–Monroy,* 332 F.3d 525, 529 (8th Cir.2003) ("Once a lawful stop has occurred, officers are entitled to conduct an investigation reasonably related in scope to the circumstances which justified the interference in the first place.") (internal citations omitted). There is no dispute that the Defendant offered two separate California documents with the same photographs, but with different subject matter information—an identification card and a driver's license. This alone provides probable cause that the Defendant had violated false document laws or, at the very least, grounds for further investigation. The offering of false documents, particularly when coupled with the reasonable suspicion that the Defendant was involved in drug trafficking, provided a basis for a *Terry* patdown. As Agent DeJoode's investigation progressed, he discovered the Defendant's criminal history included drug violations and false identification charges. Upon more questioning, the Defendant admitted he just arrived at the Residence the day before, further solidifying Agent DeJoode's suspicion that the Defendant was linked to the criminal activity described in the search warrant application. The investigation further revealed the social security number used by the Defendant was issued before the date of birth on the identification document itself, a strong indication that one or both documents offered to Agent DeJoode were falsified. The investigation at the scene, the drive to the nearby State Patrol Headquarters, and the involvement of BICE all took approximately thirty minutes to accomplish—well within the reasonable time frame necessary to protect the Defendant's constitutional rights in the context of the stop in this case. The arrest of the Defendant and the subsequent legal inventory of the Jetta all flow from the probable cause established in this period. Accordingly, the Defendant's argument that the Government violated his 4th Amendment rights following the traffic stop on July 8, 2004 is unsupported by the facts.

### III. CONCLUSION

For the reasons stated herein, Defendant's Motion to Suppress Evidence (Clerk's Nos. 35, 76, and 88) is DENIED. Accordingly, the evidence related to the stop and arrest of the Defendant on July 8, 2004, notwithstanding other evidentiary issues that may arise, is admissible as to the charges alleged against him in the original and superseding indictments. Clerk's Nos. 1 and 41.

IT IS SO ORDERED.