**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Coye Denise GREEN, Defendant–Appellant.**

**No. 94–1675.**

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1994.

Decided April 13, 1995.

Christopher Harlan, Kansas City, MO, argued, for appellant.

William L. Meiners, Kansas City, MO, argued, for appellee.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and MELLOY\*, Chief District Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Coye Denise Green appeals from her conviction for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1988) and 21 U.S.C. § 841(b)(1)(B) (Supp. V 1993). Green entered a conditional plea of guilty and now appeals the district court's denial of her motion to suppress cocaine discovered during an airport stop and search. Green argues that no reasonable articulable suspicion supported the investigatory stop or the seizure of her bag, and that consequently her consent to the search of the contents of her bag was invalid. We reverse the district court's denial of the motion to suppress, which, in turn, requires that we reverse the conviction.

Green arrived at the Kansas City, Missouri, International Airport on a plane from Phoenix, Arizona. She was stopped by Detective Paul Carrill of the Platte County, Missouri, Sheriff's Department. Carrill had been assigned to the interdiction squad at the airport for approximately four years, and the squad targeted flights originating from drug source cities such as Phoenix and Los Angeles. Phoenix is an America West Airlines hub, and passengers from other source cities such as Los Angeles and Burbank frequently change planes there.

Green attracted Carrill's attention because she was a female, travelling alone, wearing dark sunglasses, a wrinkled jacket, and car-

\* The HONORABLE MICHAEL J. MELLOY, Chief United States District Judge for the Northern

rying a leather duffle bag, but no purse.[1] Her clothes appeared to be new and baggy. In Carrill's experience, people who are carrying drugs often wear baggy new clothes and do not carry purses. As Green exited the plane, she did not make eye contact with Carrill or anyone else, but had a fixed focus on the exit door. She appeared to be in a hurry. She crossed the street to the taxicab stand and appeared panicky when no cabs were there. She was cradling the duffle bag in her arms in a protective manner. She returned inside walking briskly almost running down the concourse. Once she got to the luggage area, she slowed down, took off her sunglasses and looked behind her, in Carrill's opinion, to see if anyone followed her. She again turned to an exit door, and looked behind her in what Carrill characterized as a countersurveillance move to see if she was being followed. She went to another cab stand. Carrill testified that in his experience drug carriers become increasingly nervous after their plan does not go as expected, and he had, in the past, seen carriers conduct counter-surveillance to see if law enforcement was keyed on them.

Carrill approached Green, showed her his badge, and asked to speak with her. Green agreed, and when Carrill asked her about where she had come from, he noticed a quake in her voice and that she appeared to be "terribly nervous." Carrill asked to see her ticket, and she rummaged through the two end pockets of her bag looking for it, but did not open the middle pocket. She said she must have left her ticket on the plane.

Carrill's and Green's testimony differs as to what occurred next. Carrill testified that when he asked to see her identification, Green stated that she had none. Green testified that she handed Carrill a California driver's license from her right-back pocket, and that when she pulled out the license, she also found her plane ticket and handed it to

him. She further testified that Carrill questioned her about the discrepancy between her name on the license, Coye Denise Green, and the name on the plane ticket, Denise Green.

The magistrate judge's findings of fact did not fully resolve this conflicting testimony. In the magistrate judge's report and recommendation, she enumerates the facts known to Carrill when the consensual encounter became an investigatory stop and makes the following statement regarding the conflicting testimony: "[t]he Court has no reason to doubt Detective Carrill's recollection in this area. Defendant, on the other hand, was admittedly nervous during this encounter and may remember the events in a slightly different manner." *United States v. Green,* No. 93–00092–01–CR–W–3, slip op. at 10 fn. 9 (W.D.Mo. Nov. 12, 1993).

Carrill further testified that Green first told him that she was visiting friends in Kansas City and was going to take a cab downtown. When he asked, she did not know her friends' names or address, but then changed her story, saying she was going to the Crown Center Hotel where her friends were going to visit her. She told Carrill that she was going to be in town for a couple of days, but he observed that she had only a small duffle bag with her.[2] In Carrill's opinion, the bag did not appear to be large enough to hold a couple of days worth of toiletries and clothing. Carrill also observed that Green was "incredibly nervous" and was sweating.[3]

After conversing with Carrill for a few minutes, Green asked Carrill why he was talking to her. He again displayed his badge, told her that he was a police officer, and that he was looking for contraband such as narcotics. He asked Green if she was carrying any narcotics, and she replied "no, none that I know of." She told Carrill that the bag was her purse, and when asked if she

---

District of Iowa, sitting by designation.

**1.** Carrill testified in cross-examination at the evidentiary hearing that Green was carrying a clutch purse, but then corrected the statement, saying that it was a leather checkbook folder which contained her identification.

**2.** Green testified that she told Carrill she was visiting relatives in Kansas City for one day.

**3.** This conversation occurred on June 14, 1993, between 4:15 and 4:30 p.m. The magistrate judge did not make a finding of fact as to the temperature that day, but Green testified that it was very warm.

packed everything in it, she said "yes, I think so." When asked if she had any drugs in the bag, she answered "no." Carrill asked Green if he could search the bag and she said "no, I don't want you to." Carrill then told Green that he wanted a trained narcotic canine to sniff her bag and that it would take about twenty minutes for the dog to arrive.[4]

Green adamantly denied having any drugs and asked if they could return to the terminal. She stopped at the curb just before going inside the terminal, opened the bag, and started rummaging through it. They went inside to an alcove in the terminal, Carrill stood at the corner of the alcove and Green was at the open end. Carrill then saw a white packet inside the bag. He asked Green what was inside the packet and asked her if she was going to get in trouble for what was in the packet. She said "yes." He asked her if it was cocaine, and she said "yes." Green then agreed to the search of her bag.[5] Upon searching the bag, Carrill discovered cocaine. He then placed Green under arrest, and gave her *Miranda* warnings.

Carrill testified that his encounter with Green before discovering the cocaine was consensual and that he never told Green that she was detained or that she was not free to go. Green testified that she did not believe that she could leave. The conversation lasted five to seven minutes before Carrill discovered the drugs. Carrill testified that, after the drugs were discovered, he seized an address book, a zipping checkbook holder which contained Green's identification and credit cards, and items of clothing and toiletries. He also testified that Green's plane ticket was later discovered in her pocket and showed that her flight originated in Burbank, California.

On the basis of this testimony, the magistrate judge, in a report and recommendation, determined that the initial encounter was consensual. Slip op. at 11. The magistrate judge also determined that when Carrill detained Green's bag in order to conduct a dog

sniff search, the encounter became an investigatory stop supported by a reasonable articulable suspicion that Green was engaged in criminal activity, and that Green's subsequent consent to the search of her bag was valid. *Id.* After conducting a de novo review, the district court judge adopted the magistrate's report and recommendation.

Whether reasonable articulable suspicion exists to justify a seizure is a mixed question of fact and law. We review the magistrate's findings of facts under a clearly erroneous standard; however, the ultimate conclusion as to whether a reasonable articulable suspicion exists is subject to de novo review. *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir.1994) (en banc).

It is well established that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place ... [and] putting questions to him if the person is willing to listen." *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir.1988) (quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality)). The initial contact between Carrill and Green was consensual. Carrill approached Green in a public place, identified himself as a police officer, and asked to speak with Green. Green agreed, and Carrill asked Green several questions. A request for information does not turn consensual questioning into an investigatory stop. *United States v. Poitier*, 818 F.2d 679, 682–83 (8th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988). Thus, initially, Green's Fourth Amendment rights were not implicated.

The encounter became an investigatory stop when Carrill, after Green denied him permission to search her bag, informed Green that he would detain her bag so that a dog could sniff search the bag. In order for police officers to briefly detain luggage for a sniff search without violating the Fourth Amendment, they must have either the own-

---

**4.** Green testified that Carrill did not tell her how long it would take the dog to arrive.

**5.** Green stated that after asking her if she would get in trouble, Carrill looked into the bag without her consent and asked what was in the package, to which she replied "cocaine."

er's consent or a reasonable suspicion supported by articulable objective facts that the luggage contains drugs. *United States v. Jones,* 990 F.2d 405, 407 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 350, 126 L.Ed.2d 314 (1993). Here, Green did not consent to the search until after Carrill detained the bag. Thus, Carrill was justified in seizing Green's bag only if he had a reasonable articulable suspicion that it contained illegal narcotics.

■ In evaluating the validity of investigatory stops, we must consider the "totality of the circumstances—the whole picture." *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Reasonable suspicion must derive from more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). Moreover, "[c]onduct typical of a broad category of innocent people provides a weak basis for suspicion." *United States v. Weaver,* 966 F.2d 391, 394 (8th Cir.) (quoting *United States v. Crawford,* 891 F.2d 680, 681 (8th Cir.1989)), *cert. denied,* —— U.S. ——, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992).

We have ruled upon numerous airport, train station, and bus terminal cases considering whether there was a reasonable articulable suspicion to justify an investigatory stop or seizure. *See United States v. O'Neal,* 17 F.3d 239, 241 (8th Cir.) (cataloging a number of these cases), *cert. denied,* —— U.S. ——, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994). The case before us is an extremely close one. We believe that it falls somewhere between the facts outlined in a number of our reported cases: *O'Neal,* 17 F.3d at 241; *United States v. Weaver,* 966 F.2d 391 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992); *United States v. Millan,* 912 F.2d 1014 (8th Cir.1990); and *United States v. White,* 890 F.2d 1413 (8th Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990).

The magistrate judge found that, when Carrill seized Green's bag, thereby converting a previously consensual encounter into an investigatory stop, he knew that: (1) Green arrived on an airplane from Phoenix, a known source city for drugs and a hub for an airline with flights originating in other source cities; (2) Green was travelling alone; (3) Green had one new bag and her clothes appeared new and baggy; (4) Green avoided eye contact with Carrill and walked hurriedly to a taxi stand; (5) Green appeared to be conducting counter-surveillance; (6) Green appeared "incredibly nervous" when Carrill talked to her to the point that Carrill felt she might run; (7) Green failed to produce a plane ticket or identification; (8) Green was vague about the purpose of her trip and where she was staying; and (9) Green carried only a small bag that did not appear to Carrill to be large enough to hold a couple days worth of toiletries and clothing.

■ A number of the factors relied upon by Carrill can be characterized as "conduct typical of a broad category of innocent people." *Weaver,* 966 F.2d at 394. We reject the notion that Green's travelling alone, carrying a small bag, wearing new and baggy clothes, and failing to make eye contact with Carrill, are in any way indicative of criminal activity. Thus, these factors cannot play a role in assessing the validity of the investigatory stop.

■ Once we exclude these factors, five observations remain which must support Carrill's reasonable articulable suspicion of criminal activity: (1) Green arrived on an airplane from Phoenix, a known drug source city; (2) Green appeared to be conducting counter-surveillance; (3) Green appeared "incredibly nervous" to the point that Carrill felt she might run; (4) Green failed to produce a plane ticket or identification; and (5) Green was vague about the purpose of her trip.

These factors are not without their weaknesses. The observation that an individual is conducting counter-surveillance can easily result from a misinterpretation of an individual's behavior. Indeed, we commented in *White* "that it is not unusual for individuals to look around in an airport to get their bearings upon arrival." 890 F.2d at 1418. Similarly, in *Reid v. Georgia,* 448 U.S. 438,

100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), the Court concluded that an officer's observation that two people walking through an airport were attempting to conceal the fact that they were together was an "inchoate, unparticularized suspicion or hunch." *Id.* at 441, 100 S.Ct. at 2754. Moreover, Carrill's description of Green's nervousness lacks the dramatic description found in a number of our other cases. *See, e.g., Weaver,* 966 F.2d at 393 (officer testified that the defendant's "voice was unsteady, his speech was rapid, hands shook and his body swayed").

Furthermore, Carrill's testimony as to whether Green produced her airplane ticket and identification conflicted with Green's testimony, and the magistrate's report and recommendation does not fully resolve the conflict. In the report and recommendation, the magistrate judge stated only that she had no reason to doubt the detective's recollection and that Green's nervousness "may have caused her to remember the events in a slightly different manner." Slip op. at 10 n. 9. At best, this is a most indirect comment on Green's testimony, and substantially less than a clear rejection of it on credibility grounds. Green argues that the finding crediting Carrill's testimony was clearly erroneous. However, it is unnecessary that we find the magistrate's finding clearly erroneous, because the magistrate judge's failure to definitively resolve the issue diminishes the weight of this factor.

Even if we accepted Carrill's testimony, Green's lack of identification does not automatically create a reasonable articulable suspicion of criminal activity, but rather is only a factor to be considered. In *Weaver,* Chief Judge Arnold, in his dissent from the majority decision upholding an investigatory stop, pointed out that "we have not yet come to the point in this country (except maybe in airports) when citizens must identify themselves to public employees." 966 F.2d at 396–97. Accepting Carrill's testimony on Green's lack of a plane ticket, we conclude that it is only tangentially relevant to the inquiry. There is nothing inherently suspicious about discarding or misplacing a used airline ticket before leaving the airport.

"In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion." *Campbell,* 843 F.2d at 1093. Once we discount the facts with which we find weaknesses, we are left with Green's arrival on a plane from a known source city, and her vagueness about the purpose of her trip. These facts are insufficient to demonstrate a reasonable articulable suspicion of criminal activity.

In finding that a reasonable articulable suspicion did exist, the magistrate judge relied almost exclusively upon our decision in *Weaver,* 966 F.2d at 391. *Weaver* is distinguishable in two respects. First, the officer in *Weaver* relied on intelligence reports received from Los Angeles authorities and arrest records indicating that young black male members of Los Angeles gangs were flooding the Kansas City area with cocaine. *Id.* at 394 n. 2. In the present case, there are no intelligence reports or arrest records. We believe this to be the most distinguishing factor in *Weaver.*[6] In the present case, Carrill merely relied upon his experience. Although we should consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals," *Campbell* 843 F.2d at 1093, suspicion based solely on an officer's experience is not as strong an indicator of criminal activity as suspicion based upon particularized intelligence reports. This is especially true when many of the officer's observations were, as we have pointed out, descriptive of conduct "typical of a broad category of innocent people." *Weaver,* 966 F.2d at 394.

Second, in *Weaver,* Weaver initially consented to the search of his bag. 966 F.2d at 393. He then changed his mind, telling the officer he was in a rush to visit his mother in the hospital, and refused to consent without a warrant. *Id.* Weaver then attempted to

---

**6.** Similar information based on intelligence reports was involved in *United States v. Condelee,* 915 F.2d 1206, 1208 (8th Cir.1990) (officers acting on information that Los Angeles Street gangs were using "sharply dressed black female couriers").

leave with his bags. *Id.* At this point, the officer decided to detain the bags and apply for a search warrant. *Id.* While we do not endorse the view that refusing to consent to the search of one's bag is indicative of criminal behavior, Weaver's initial consent and the manner in which he withdrew his consent contributed to the officer's reasonable articulable suspicion.

Green is closer to several other decisions in this circuit. In *O'Neal*, we found no reasonable articulable suspicion when the defendants arrived on a bus from a source city, produced an Illinois Public Welfare card as identification, were "sweating profusely" and "appeared nervous." 17 F.3d at 241. In *White*, we held that officers did not have a reasonable articulable suspicion based on their observations that White arrived on a plane from a source city, appeared to be conducting counter-surveillance, acted nervous, and purchased a one-way ticket with cash. 890 F.2d at 1417–18. Likewise, in *Millan*, we concluded that officers did not have a reasonable articulable suspicion when they observed that Millan arrived on a plane from a source city, was vague about the purpose of his trip, walked rapidly through the airport, and had purchased a one-way ticket with cash. 912 F.2d at 1014, 1017.

After closely looking at the facts outlined by the district court and giving less weight to the facts which we conclude have considerable weaknesses, we are forced to conclude that the facts are insufficient to establish a reasonable articulable suspicion of criminal activity. As the consent to search the luggage was infected by the unlawful investigatory stop, the fruits of the seizure came from the poisonous tree. Accordingly, we reverse the district court's order denying the motion to suppress, and reverse Green's conviction.