UNITED STATES of America,
Plaintiff,

v.

Fidel MENDOZA–CARRILLO,
Defendant.

No. CR 00–400017.

United States District Court,
D. South Dakota,
Southern Division.

Aug. 1, 2000.

Michelle Tapken, United States Attorney's Office, Sioux Falls, SD, for plaintiff.

Julie Irvine, Public Defender's Office, Sioux Falls, SD, for defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

Plaintiff, the United States of America, has filed objections to Magistrate Judge Marshall's Report and Recommendation of April 28, 2000, recommending that the Defendant's Motion to Suppress be granted. For the reasons stated below, the Court agrees with the Magistrate Judge's recommendation and grants Defendant's Motion to Suppress.

### *FACTUAL BACKGROUND*

The Court adopts, with modifications, the facts as found by Magistrate Judge Marshall.

On February 8, 2000 at approximately 7:40 p.m., South Dakota Highway Patrol Trooper Pete Eng initiated a traffic stop on a vehicle driven by George Small because its taillights were not functioning. (Transcript of March 13, 2000 Hearing ("TR1") at 4.) Trooper Eng approached the vehicle, explained to the driver why he had been stopped and requested proof of insurance, vehicle registration and Mr. Small's driver's license. (TR1 at 4–5.) At that time Trooper Eng observed the pas-

senger in Mr. Small's vehicle, Mr. Mendoza–Carrillo, the defendant in this case, was slightly bent forward and looking away from him. (TR1 at 5.) Based on his experience with numerous traffic stops over the years Trooper Eng believed Defendant's behavior was unusual as most people make eye contact with him and seem interested in why the vehicle was stopped. (TR1 at 5.) Trooper Eng admitted it is possible, however, that the reason Defendant was looking away from him was because Defendant is the person who retrieved the registration and proof of insurance from the glove box. (TR1 at 10.) Mr. Small confirmed it was, in fact, Defendant who had obtained the documents from the glove compartment. (TR1 at 26.)

After the requested documents had been produced, Trooper Eng asked Mr. Small to come to his patrol car. (TR1 at 5.) According to the videotape, while in the patrol car, Trooper Eng asked Mr. Small who the passenger was with him in the vehicle.[1] (TR1 at 6.) Mr. Small indicated it was a gentleman he had worked with for approximately six months named Jose and said he thought his last name was Mendez. (TR1 at 6.) Trooper Eng thought this unusual because six months is a lengthy amount of time and he believes a person would know the name of the person they are working with, especially if they drove back and forth to work together. (TR1 at 6, 21–22.) Further, Trooper Eng believed the passenger's name, as relayed by Mr. Small, was of significance because he believed he may have seen an outstanding warrant for a Mendez. (Transcript of April 24, 2000 Hearing ("TR2") at 5.) Trooper Eng checked the two county warrant lists he keeps in his vehicle to determine if a Mendez was listed but found no record. (TR1 at 6; TR2 at 6.)[2]

1. Trooper Eng's recollection of the exact sequence of events differs slightly from the sequence of events as recorded on the videotape in several places. This difference is not significant to the Court's analysis. However, for the sake of clarity in stating the facts, the Court relies more heavily on the videotape to summarize the sequence of events.

2. The trooper explained at the hearings that some smaller counties do not enter warrants into the state or NCIC computer systems for financial reasons but instead publish a list for patrol officers to keep in their vehicles for reference. (TR2 at 10–11.)

Trooper Eng then issued Mr. Small a warning ticket, told Mr. Small that was all he had for him and then stated that he was going to speak with Defendant to make sure there was no paperwork on him. (Videotape ("VT") 19:42:24–41; TR1 at 5–6.) Trooper Eng and Mr. Small then exited the patrol car and returned to Mr. Small's vehicle. (TR1 at 6.) As they were walking towards the car, Trooper Eng heard Mr. Small make the comment "almost made it" and then indicate something to the effect of "we just turn right up here." (TR1 at 6.) On the videotape, it sounds like Trooper Eng chuckled in response. (VT 19:42:48.) Once at the vehicle, Trooper Eng requested that Defendant come back to his patrol car. (TR1 at 6.) Trooper Eng asked Defendant if his last name was Mendez to which Defendant replied, "Mendoza." (VT 19:43:15.)

According to the videotape, once in the patrol car, Trooper Eng asked Defendant if he had ever been in trouble before for anything and mentioned that he believed he had paperwork for what he thought was a Mendez. (VT 19:43:36.) He then asked Defendant his first name, to which Defendant replied "Fidel Mendoza." (VT 19:43:49; TR1 at 7.) Defendant was asked if he had ever had a driver's license but Defendant stated he did not. (VT 19:44:37; TR2 at 6.) Trooper Eng then radioed State Radio and asked the dispatcher to run a check on the name and date of birth that Defendant had given but no record was found. (TR1 at 7.) While waiting for the results of the check, Trooper Eng then asked Defendant where he was from to which Defendant replied "Mexico." (VT 19:45:13–15; TR1 at 7–8.) In a continued effort to confirm his identity, Trooper Eng next asked Defendant for his resident alien card, and Defendant replied that he did not yet have one. (TR1 at 8; TR2 at 19–20.) In response to further questioning Defendant stated he had been in the United States for one year and did not respond to a question as to whether he was in the United States illegally. (TR1 at 8.) The videotape reflects that at this point Trooper Eng told Defendant that he would find out "one way or another" whether Defendant was an illegal alien. (VT 19:46:09.)

After more questioning, Trooper Eng then asked the State Radio dispatcher to contact someone from the Immigration and Naturalization Service ("INS") for assistance. (TR1 at 8; TR2 at 7.) Subsequently Agent Lusk, from the INS office in Chicago, contacted Trooper Eng via Eng's cell phone. (TR1 at 8.) Agent Lusk determined that Defendant's correct last name was Carrillo–Mendoza and that he had previously been arrested on a charge of entry without inspection. (TR1 at 8–9.) After Agent Lusk had a brief telephone conversation with Defendant, Agent Lusk informed Trooper Eng that Trooper Eng did not have arrest powers but advised him to detain Defendant and transport him to the nearest jail facility. (TR1 at 9.) Trooper Eng advised Defendant that, per the INS agent's instructions, Eng could not place him under arrest but that Eng was to detain Defendant and take him to the Winner Police Department where INS would interview him. (TR2 at 9.)

Trooper Eng handcuffed Defendant and transported him to the Winner Police Department. (TR1 at 14.) Once there, Trooper Eng telephoned Agent Lusk and was advised that Lusk would be faxing a detainer for Defendant to the Winner Police Department. (TR1 at 14–15.) The Record of Deportable and Admissible Alien was apparently faxed to the Winner Police Department at 10:14 p.m. on February 8, 2000. (TR1 at 15–17.)

Trooper Eng never advised Defendant of his Miranda rights nor was there an interpreter present during Trooper Eng's conversations with Defendant. (TR1 at 13.)

### DISCUSSION

### I. STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(B), "a judge may also designate a magistrate to conduct ... evidentiary hearings, and to

submit to a judge of the court proposed findings of fact and recommendations for the disposition." If one of the parties involved files timely objections to the Magistrate's report and recommendation, the District Court judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).

## II. ILLEGAL DETENTION

██ This Court does not disagree with the parties or the Magistrate that the initial traffic stop was proper and not in violation of the Fourth Amendment. *See United States v. Barry,* 98 F.3d 373, 376 (8th Cir.1996) *quoting United States v. Barahona,* 990 F.2d 412, 416 (8th Cir. 1993). However, the questioning of Defendant was a violation of Defendant's Fourth Amendment rights as it was not a proper expansion of the traffic stop and was not proper as a new detention after the completion of the traffic stop.

### A. *Traffic Stop*

██ A reasonable investigation of a traffic stop includes asking (1) "for the driver's license and registration," (2) "requesting the driver to sit in the patrol car," and (3) "asking the driver about his destination and purpose." *United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir. 1994). The trooper's questions, however, must be "reasonably related to the stop." *Id.* In addition, an officer may "engage in similar routine questioning of the vehicle's passengers to verify information provided by the driver." *United States v. Johnson,* 58 F.3d 356, 357 (8th Cir.1995). An officer may expand the scope of the traffic stop if "reasonably related questions raise inconsistent answers, or if the licenses and registration do not check out," both of which might raise an officer's suspicion. *Ramos,* 42 F.3d at 1163. Similarly, " 'if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.' " *Johnson,* 58 F.3d at 357 *quoting Baraho-*

*na,* 990 F.2d at 416. However, the scope of a traffic stop may not be expanded without "objective circumstances" which might raise additional suspicion. *See Ramos,* 42 F.3d at 1163.

Trooper Eng's questioning of Defendant was not a proper expansion of the traffic stop. There were no "objective circumstances" that might have supplied Trooper Eng with additional suspicion. *See Ramos,* 42 F.3d at 1163. Trooper Eng's questioning of Mr. Small did not result in any inconsistent answers and Mr. Small's license and registration checked out. Trooper Eng, however, contends that he had reasonable suspicion to extend the scope of the stop based on three factors. The Court adopts the Magistrate Judge's recommendation, with the following modifications, that each of these factors be found insufficient to provide the requisite reasonable suspicion.

██ First, Trooper Eng's claim that Defendant did not make eye contact with him when he first approached the car is not enough to establish reasonable suspicion. The mere avoidance of eye contact is not "in any way indicative of criminal activity." *United States v. Green,* 52 F.3d 194, 198 (8th Cir.1995); *see also United States v. Halls,* 40 F.3d 275, 276 (8th Cir.1994). Further, Trooper Eng admitted that it is possible that Defendant was reaching into the glove compartment to retrieve the necessary papers for the driver, Mr. Small. Therefore, Defendant's lack of eye contact is not a basis for reasonable suspicion.

██ Second, the fact that the driver, Mr. Small, was unsure of Defendant's last name despite having worked with him for six months is not enough to arouse reasonable suspicion of criminal activity. Trooper Eng admitted that he did not know how often Defendant and Mr. Small actually worked together or how often they rode to work together. Mr. Small's uncertainty as to Defendant's name was not enough to raise suspicion.

■ Third, the "almost made it" remark from Mr. Small as both he and Trooper Eng returned to Mr. Small's vehicle is not enough to raise reasonable suspicion. Trooper Eng admitted that prior to this remark, Mr. Small had told him that he knew his taillights were out and that he had passed other law enforcement officers on the way home. Also, Trooper Eng testified that at the same time Mr. Small made the "almost made it" remark he also indicated that he was turning off the road just a short distance away. Further, on the videotape, it sounded as if Trooper Eng chuckled in response to the comment. It seems clear that Mr. Small was referring to the fact that he almost made it home without receiving a ticket for the broken taillight. Therefore, this remark does not amount to an objective circumstance that could have reasonably raised the suspicions of Trooper Eng regarding Defendant.

As none of the circumstances surrounding the search should have raised any suspicions regarding Defendant, the questioning of Defendant was not a proper expansion of the traffic stop.

B. *New Stop*

■ If the detention of Defendant was not a proper extension of the traffic stop, the motion to suppress must be granted unless the detention can be justified as a new stop. An officer may not continue to detain a vehicle or its occupants once he has finished processing the traffic violation unless events occurred during the traffic stop to give rise to "a reasonable, articulable suspicion that … criminal activity may have been afoot." *United States v. Beck*, 140 F.3d 1129, 1134–35, 1136 (8th Cir.1998). In *Beck*, the Eighth Circuit found that the traffic stop was complete because the officer had returned the driver's license and registration, issued a verbal warning and told the defendant he was free to go. *Id.* at 1132, 1136. The same is true here. Trooper Eng had issued a warning ticket to Mr. Small and stated that he had nothing else for Mr. Small before he began questioning

Defendant. Therefore, since the traffic stop was complete, the Government must show that Trooper Eng had a reasonable, articulable suspicion to begin questioning Defendant. The Government has failed to do this.

■ The reasons offered by Trooper Eng as justification for his aroused suspicion, discussed above, were not sufficient to expand the scope of the traffic stop, and are also not sufficient to support a new detention of Defendant. For example, as noted, neither the fact that Mr. Small was unsure of Defendant's name nor the "almost made it" comment provided Trooper Eng with "articulable suspicion." Further, Trooper Eng testified that the "almost made it" comment just "threw another flag." Reasonable suspicion, however, "must derive from more than an 'inchoate and unparticularized suspicion or hunch.'" *Green*, 52 F.3d at 198 *citing Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). The reasons offered by Trooper Eng for his suspicions do not amount to more than hunches.

■ Moreover, the fact that Trooper Eng believed he might have a warrant for someone named Mendez does not provide reasonable suspicion. The Supreme Court has held that an officer may stop and question a person if the officer has "a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 228–29, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). The officers in *Hensley*, properly detained the defendant because, while they did not have a warrant for his arrest, they knew that this particular defendant was wanted for questioning in connection with a crime committed in a neighboring town. *Id.* at 223–24, 232–33, 105 S.Ct. at 677–78, 682 (the defendant was the subject of a "wanted flyer" distributed to surrounding neighborhood police departments). Here, Trooper Eng merely believed that he might have a warrant for someone named

Mendez but he did not know if he did in fact have a warrant for a Mendez, let alone a warrant for this particular defendant. An officer may not detain a person on the basis of a hunch. *See Green,* 52 F.3d at 198; *see also Beck,* 140 F.3d at 1136 *citing United States v. Campbell,* 843 F.2d 1089, 1093–94 (8th Cir.1988). Trooper Eng's belief that he may have had a warrant for Defendant was only a hunch. Therefore, he did not have the necessary reasonable suspicion to detain Defendant. Without such a safeguard, any officer could approach any citizen, demand to know their name and proceed to detain them if the name sounded remotely familiar as one that was possibly the subject of a warrant.

### III. THE GOVERNMENT'S OBJECTIONS

#### A. *The Magistrate's Factual Findings*

 The Government's motion does not specifically state which factual findings it objects to, but merely reiterates its version of the facts. Upon comparison of the two factual statements, it becomes clear that the Government is concerned with three particular omissions in the Magistrate Judge's version of the facts. None of the omissions cited by the Government, however, would alter the finding that Trooper Eng did not have reasonable suspicion to detain Defendant.

First, the Government contends that the Magistrate Judge did not properly consider the fact that Trooper Eng felt that he would let Defendant go when he discovered that Defendant's name was Mendoza and not Mendez—the individual for which he believed he might have a warrant. This fact has no bearing on whether Trooper Eng had the requisite reasonable suspicion to question Defendant in the first place.

Second, the Government contends that the Magistrate Judge did not properly consider the fact that it is routine for an officer to radio the dispatcher to help identify a person without identification who is detained. This may be true. However, whether or not Trooper Eng followed the correct procedure while detaining Defen-

dant is not relevant to the question of whether detaining Defendant was proper to begin with.

Third, the Government contends that the Magistrate Judge did not consider Trooper Eng's statement that he did not become suspicious that Defendant was an illegal alien until Defendant could not produce identification. The fact that Trooper Eng became suspicious that there was criminal activity afoot after he detained Defendant is not relevant to the question of whether Trooper Eng had reasonable suspicion to detain Defendant. Indeed, such a statement supports the finding that Trooper Eng did not have the requisite reasonable suspicion prior to detaining Defendant.

#### B. *The Magistrate's Legal Conclusions*

The Government contends that the Magistrate Judge's conclusion that Trooper Eng did not have a proper basis for detaining Defendant to ascertain his identity was wrong and contrary to the evidence. The Government argues that the Magistrate Judge did not properly consider (1) Trooper Eng's testimony that he detained Defendant because he believed he had a warrant for a Mendez or (2) that the driver and Defendant gave inconsistent information regarding Defendant's name. The Government is correct that the Magistrate Judge's Report does not deal with Trooper Eng's claim that he was suspicious because he believed he had a warrant for someone named Mendez. As shown above, however, Trooper Eng's belief that he might have a warrant for someone named Mendez did not provide the reasonable suspicion needed for his detention of Defendant.

The Government cites two cases in support of its contention that the Magistrate Judge failed to consider that the driver and Defendant's answers regarding Defendant's name were inconsistent. The Government cites *United States v. Cummins,* 920 F.2d 498 (8th Cir.1990) for the proposition that an officer may question the passengers in a vehicle to verify information

provided by the driver. The Government claims this is what Trooper Eng was doing when he questioned Defendant: that Trooper Eng was verifying the information regarding Defendant's name which was given to him by the driver, Mr. Small. In *Cummins*, however, the Trooper asked the defendant/passenger to verify the explanation given by the driver for the traffic violation which was that the driver had been distracted by the passenger's conversation. *See* 920 F.2d at 502. Thus, the questioning in *Cummins* was not directed solely towards the identity of the passengers. Also, the questioning in *Cummins* took place while the traffic stop investigation was ongoing. *Id.* When Trooper Eng questioned Defendant in this case the ticket had already issued and the stop was complete. Defendant, therefore, was not asked to verify any information relating to the traffic stop.

The Government also cites *United States v. Edmisten*, 208 F.3d 693 (8th Cir. 2000) for a similar proposition. In *Edmisten*, the Eighth Circuit indicates that an officer can ask a passenger to verify the information regarding the passenger's identity given to them by the driver. *See* 208 F.3d at 693–94. Certainly, this case does present a more factually analogous scenario than the other cases cited by the Government. However, it is still distinguishable. In *Edmisten* the officers questioned the passengers pursuant to the traffic stop. *Id.* Trooper Eng's questioning, however, was not pursuant to the traffic stop but was a new search which, as shown above, was not based on the required reasonable suspicion. In addition, the passengers in *Edmisten* were already suspects in an assault and had been the subjects of a radio dispatch describing them and their location. *See* 208 F.3d at 693. Thus, the driver's alleged inability to remember the names of the passengers whom he claimed to have known for years was rendered more suspicious by these circumstances than it might ordinarily have been. The officers in *Edmisten* might reasonably have believed that the driver was seeking to protect these pas-

sengers who were suspected to have just committed a crime. Since there was no indication that Defendant was involved in criminal activity, however, Trooper Eng had no reason to believe Mr. Small's uncertainty as to Defendant's name was an attempt to protect Defendant.

■ The Government also complains that the Magistrate Judge was wrong in concluding that Trooper Eng questioned Defendant about his identity because he was Hispanic. This was not the sole basis for the Magistrate Judge's recommendation that the evidence be suppressed. However, as noted by the Magistrate Judge, "the Fourth Amendment ... forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581–82, 45 L.Ed.2d 607 (1975). In *Brignoni–Ponce*, the Supreme Court found that a person's Mexican ancestry and proximity to the Mexican border did not provide an officer with reasonable suspicion that such person was an alien. *Id.* at 885–86, 95 S.Ct. at 2582–83. Certainly, there were no circumstances that reasonably led Trooper Eng to believe Defendant was an alien prior to detaining him. Indeed, Trooper Eng admits that he did not become suspicious of Defendant's alien status until Defendant could not produce identification. Moreover, as shown above, none of the reasons offered by Trooper Eng provided adequate reasonable suspicion for the detention. The circumstances of the traffic stop here did not provide any reason to suspect Defendant of criminal activity. As a result, it is difficult to believe that Defendant's ethnicity did not play a significant role in raising Trooper Eng's suspicions.

## IV. SUPPRESSION OF IDENTITY

■ The Government also objects to the suppression of Defendant's "identity (fingerprints)," arguing that identity is not suppressible. In support of its contention,

the Government cites the Supreme Court in *INS v. Lopez–Mendoza,* 468 U.S. 1032, 1039, 104 S.Ct. 3479, 3483–84, 82 L.Ed.2d 778 (1984), as stating that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." The Court finds, however, that this language does not preclude the suppression of Defendant's fingerprints or any statements he made while detained.

■ The context of the language quoted above and the authorities cited by the Supreme Court as support for the proposition, are key to its understanding. One of the defendants in *Lopez–Mendoza* objected to the court's jurisdiction over his person on the grounds that the arrest was illegal. *See* 468 U.S. at 1040, 104 S.Ct. at 3484. That defendant did not object to any evidence offered against him. *Id.* Therefore, the posture of the case indicates that the Supreme Court language only addresses the jurisdictional concern that the "body" of the defendant is never suppressible, not whether statements by a defendant regarding his identity may be suppressed. This interpretation is supported by an examination of the authorities cited by the Supreme Court: *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) and *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). In *Frisbie,* the Court held that "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction" against his will. 342 U.S. at 522, 72 S.Ct. at 511. The Supreme Court reaffirmed this holding in *Gerstein,* stating that an "illegal arrest or detention does not void a subsequent conviction." 420 U.S. at 119, 95 S.Ct. at 865. These cases deal with jurisdiction over the person, not evidence of the defendant's identity illegally obtained. The language in *Lopez–Men-*

*doza* should only be interpreted to mean that a defendant may be brought before a court on a civil or criminal matter even if the arrest was unlawful.[3]

The Eight Circuit has not squarely addressed this issue. In a forfeiture case, the Eighth Circuit cited *Lopez–Mendoza* as support for the assertion that "forfeitable items, would not be inadmissible even if they had been seized in violation of the Fourth Amendment." *United States v. Twelve Thousand, Three Hundred Ninety Dollars,* 956 F.2d 801, 806 (8th Cir.1992). Forfeitable items, however, are the equivalent of the "body" of a defendant in that the court may have jurisdiction over them regardless of how they were seized. These items, however, do not have an "identity" to suppress. Thus, this finding is consistent with this Court's interpretation of *Lopez–Mendoza* and does not begin to address the broader question of whether the language of *Lopez–Mendoza* forbids the suppression of a defendant's statement of his identity made during an illegal search.

Other circuits, however, have interpreted the language in *Lopez–Mendoza* to mean that identifications of a defendant by an arresting officer or a defendant's initial statement of his name may not be suppressed. In *United States v. Guzman–Bruno,* 27 F.3d 420 (9th Cir.1994), the Ninth Circuit held that a defendant's identity need not be suppressed because there is " 'no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or other independent evidence'." 27 F.3d at 421–22 *citing United States v. Orozco–Rico,* 589 F.2d 433 (9th Cir.1978). Therefore, the Ninth Circuit concluded that the Government could prove its case of illegal reentry simply by virtue of the officer's identification of the defendant. *See Guzman–Bruno,* 27 F.3d

**3.** Other courts have interpreted the Supreme Court's language in this way. For example, the Seventh Circuit has cited *Lopez–Mendoza* as support for the proposition that the exclu-

sionary rule does not apply to the body of a defendant. *See United States v. Mitchell,* 957 F.2d 465, 470 (7th Cir.1992).

at 422; *see also United States v. Roque–Villanueva*, 175 F.3d 345 (5th Cir.1999).[4]

Interpreting the language of *Lopez–Mendoza* in this way, however, raises some serious concerns. The Supreme Court has opined that while Congress has broad powers over immigration, such power "cannot diminish the Fourth Amendment rights of citizens who may be mistaken for aliens." *Brignoni–Ponce*, 422 U.S. at 884, 95 S.Ct. at 2581. At least with regard to illegal reentry cases, the Government's interpretation of *Lopez–Mendoza* allows law enforcement agents to approach anyone at anytime, even in an egregious or violent manner, which was not the case here, and demand that the person identify themselves and then would allow the government use that information against that person. The Court acknowledges that the INS must have a way to combat illegal reentry. However, giving law enforcement officials an incentive to discover a person's identity in whatever way they can puts the privacy rights of legal aliens and any citizen that might for any reason be suspected of illegal entry at too great a risk. In addition, the suppression of the defendant's statement of his identity will not hamper the INS in civil deportation proceedings. *See Lopez–Mendoza*, 468 U.S. at 1043, 104 S.Ct. at 3485 (holding that the exclusionary rule does not apply to civil deportation hearings where INS must only prove identity and alienage). Therefore, this Court declines to follow *Guzman–Bruno* and holds that while an illegal detention will not free a defendant from the jurisdiction of a court, the evidence resulting from that illegal detention, including the defendant's statement of his identity, can be suppressed.[5]

While the question of suppressing Defendant's statement of his name is difficult, the Government's objection to the suppression of Defendant's fingerprints is less so. Fingerprints which are the result of an illegal detention may be suppressed. *See Hayes v. Florida*, 470 U.S. 811, 813–817, 105 S.Ct. 1643, 1644–47, 84 L.Ed.2d 705 (1985); *see also Davis v. Mississippi*, 394 U.S. 721, 724, 89 S.Ct. 1394, 1396, 22 L.Ed.2d 676 (1969). This Court will not read the language in *Lopez–Mendoza* to preclude the suppression of fingerprints as it would be inconsistent with the long-standing rule regarding the suppression of fingerprints. Therefore, since the detention of Defendant was unlawful, Defendant's fingerprints will be suppressed.

The Government also relies on *United States v. Pineda–Chinchilla*, 712 F.2d 942 (5th Cir.1983) in which the Fifth Circuit's holding was limited to a finding that the defendant did not have a privacy interest in his INS file and therefore, it could not be suppressed. Defendant has not moved to suppress his INS file. As a result, the Government's reliance on this case is misplaced. Accordingly,

IT IS ORDERED:

1. That Defendant's Motion to Suppress all evidence obtained as a result of the illegal detention of Defendant is GRANTED;

---

4. Similarly, in an unpublished opinion, the Tenth Circuit has interpreted *Lopez–Mendoza*'s language to preclude the suppression of a defendant's statement of his name prior to any Miranda warnings. *See United States v. Cisneros–Cruz*, No. 98–1398, 1999 WL 444926 at *6 (10th Cir. June 30, 1999).

5. This holding would not prevent an officer from identifying a defendant by sight without revealing any statements that defendant may have made.