**UNITED STATES of America,**
**Plaintiff,**

v.

**Oscar RAMIRES, Fidel Chaidez,**
**Hector Chaidez, and Romel**
**Verde, Defendants.**

No. 4:00CR103.

United States District Court,
D. Nebraska.

April 9, 2001.

John C. Vanderslice, Fed. Public Defender's Office, Lincoln, NE, for Oscar Ramires.

Julie A. Frank, Frank, Gryva Law Firm, Omaha, NE, for Fidel Chaidez.

Robert B. Creager, Anderson, Creager Law Frim, Lincoln, NE, for Hector Chaidez.

Joseph F. Gross, Jr., Timmermier, Gross Law Firm, Omaha, NE, for Romel Velarde.

Michelle J. Oldham, Hall County Atty., Grand Island, NE, for U.S.

## MEMORANDUM AND ORDER

KOPF, District Judge.

The defendants are charged with possession with intent to distribute 500 grams or more of methamphetamine. They object (filings 53, 54, 55, 56) to Magistrate Judge Piester's report and recommendation (filing 51) that their oral motions to "challenge [the] arrest[s]" (filing 41 at 12) be denied. After careful review, I adopt the report and recommendation and set forth additional reasons why the motions should be denied.

### I. BACKGROUND

A brief summary of the odd circumstances of this case is in order. I proceed to that task next.

#### A. The Seizure of the Drugs

While drinking at a bar, the defendants claim that Uriel Lopez and they were invited by a stranger called "Jose" to come to his apartment.[1] They accepted the invitation. According to the defendants, shortly after arriving at the apartment, Jose left his new friends alone in the apartment. They claim that after about an hour, the police forcibly entered the apartment, without a warrant, and seized drugs.

In an earlier decision (filing 52), I agreed with Judge Piester that the Fourth Amendment did not protect the four defen-

---

1. This claim was presented through the testimony of the one defendant who was found in the apartment with the drugs. As will be seen later, by the time the police entered the apartment, the other defendants had left through a tunnel or crawl space. To support their motion to suppress the drugs, the three "tunnel" defendants adopted the testimony of their compatriot who was found in the apartment.

dants from the seizure of these drugs. We reasoned that they had no reasonable expectation of privacy in Jose's apartment or any of its contents even though the search may have been invalid if challenged by someone else. *See, e.g., Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (apartment visitors who stayed for a few hours, who lacked any previous connection with renter of apartment, and who visited apartment for commercial purpose of packaging cocaine had no legitimate expectation of privacy in the apartment).

### B. The Arrest of the Defendants

After ruling that the defendants could not suppress the drugs, Judge Piester heard additional evidence and argument about the arrest of the defendants. The arrest of the men took place immediately after the drugs were located, although three of the men were detained outside the apartment a few minutes before the drugs were found.

At about 9:00 p.m., two police officers were dispatched to the apartment house where Jose's apartment was located.[2] It was dark. The officers were told that there had been complaints about the smell of illegal drugs at the apartment building.

When the officers got to the apartment house, they did not smell drugs. Nevertheless, Officer McConnell, who had been called to that house a number of times before, proceeded down a short flight of steps into a dark common area in the basement.[3] He heard voices from behind a door. Through the bottom of the otherwise shuttered glass door, he could see at least three pair of legs. He knocked. He

then identified himself as a police officer. As soon as he did so, he heard and saw the legs run from the door.

At that point McConnell instructed his partner to go outside. Presumably, that officer was prepared to stop and question anyone leaving the apartment from a rear exit. McConnell called for additional back-up. He then turned the knob on the door, but the door was locked. McConnell tried to force the door open by kicking it. He was unsuccessful.

As he was doing this, he heard something behind him. Fearing for his safety, McConnell turned away from the door, and directed his flashlight beam at a sound. The sound was coming from midway up the wall that he was now facing. Elevated above the floor was a tunnel or crawl space.[4]

As he looked further, McConnell saw that a man was crawling out of the tunnel. McConnell pulled his weapon, yelled "freeze," helped the man to the ground, and handcuffed him. He then saw that two other men were in the tunnel, and McConnell did the same to them. Those three men were Oscar Ramires, Fidel Chaidez, and Hector Chaidez.

By this time, between four and six additional officers had arrived. While detained during this time, the three men from the tunnel were asked whether they lived in the apartment. They responded in the negative. During this time, there is no evidence and there is no claim that the police recovered items of evidentiary value from the men and there is no claim or evidence that the men made inculpatory statements.[5] The men remained hand-

---

2. The building was a house that had been converted to apartments. (*See* Ex. 105.)

3. *See* Exs. 108 & 110.

4. *See* Ex. 115.

5. In fact, the prosecutor agreed to stipulate that she would not use any statements made by the men at the scene after their detention. (Tr. 66.) She also indicated that she would stipulate not to use any tangible evidence taken from their persons at the scene. (Tr. 66.)

cuffed and on the ground as the police officers proceeded to investigate further. At that time, the three men were not formally placed under arrest.

Unsure of whether there were more men in the tunnel, one officer crawled into it. He proceeded through the tunnel until it opened in the apartment where the drugs were eventually found. At about the same time, Sergeant Elliott began to try to gain entrance to the apartment through the door. Elliott knocked and announced that if the door was not opened, force would be used to gain entry. With that, the door swung open and the police entered. At virtually the same time, the officer in the tunnel crawled into the apartment.

As soon as the door opened, Elliott observed two men. At that same moment, near the men, he observed narcotic residue covering an entire table. He saw a large quantity of packaged narcotics on the table as well. He estimated that there were several pounds of drugs laying on it. In addition, Elliot saw packaging materials and a scale.[6]

Upon seeing the drugs, the two men in the apartment—Romel Verde and Uriel Lopez[7]—were immediately arrested for possession of a controlled substance with intent to deliver. At the same time, the three men from the tunnel were likewise arrested for possession of a controlled substance with intent to deliver.

6. In an affidavit for search warrant, which was submitted after the incident, Elliott described the scene this way: "As I stepped into the apartment, directly to my right was a small kitchen table with 6–8 packages of a white powdery substance rolled in cellophane wrapping, a large gallon size zip lock baggie which appeared to be half full of a crystallized off white substance, an electronic scale, numerous baggies and ripped pieces of cellophane, a large cooking spoon which was covered with a white powdery residue along with the majority of the kitchen table being covered with a white powdery residue." (Filing

## II. REVIEW

While the facts of this case are unusual, there is no basis upon which to suppress the "arrests." In addition to the reasons set forth by Judge Piester, the motions should be denied on the following grounds as well.

### A. The Manner in Which the Police Entered the Apartment is Irrelevant and Once the Police Saw the Drugs, They Had Probable Cause to Arrest All Four Men.

All four defendants continue to complain about how the police gained entry into the apartment. They lost that battle earlier. Stated differently, the men had no expectation of privacy in the apartment or its contents. Thus, the men have no constitutional basis upon which to complain about how the entry was gained. Therefore, evidence about how the police entered the apartment is irrelevant.[8]

In contrast, the relevant point is this: Once the police entered the apartment and found the large quantity of drugs and related trafficking materials in open display, they had probable cause to arrest all four defendants. This was true for the defendant found in the apartment standing near the table covered with drugs. *See, e.g., United States v. Holder,* 990 F.2d 1327, 1328–29 (D.C.Cir.1993) (probable cause to arrest existed where a

34, Attachment, at 3.) Later, the officers found two other dirt crawl spaces and additional drugs. (*Id.* at 4.)

7. Lopez, who was only 17 years of age, was not named as a defendant in the federal indictment.

8. Such evidence would, however, be relevant if Jose, the putative apartment dweller, filed a suppression motion. *He* might have a legitimate expectation of privacy. But, alas, the wily Jose is nowhere to be found.

suspect was found in an apartment standing near a table full of cocaine). It is also true for the defendants who were found immediately outside, and who had just come from, the apartment where the drugs and trafficking material were later found openly displayed on a table. *See, e.g., United States v. Garcia,* 197 F.3d 1223, 1226–27 (8th Cir.1999) (when drug activity was later found in the apartment, there was probable cause to make a warrantless arrest of a man who was briefly detained as he was about to enter the apartment).

Stated differently, before the arrests, the police knew the following facts: (1) they had recently received complaints about the smell of drugs in the apartment building; (2) at least three pairs of legs ran away from the apartment door upon merely hearing a police officer knock and announce his presence outside the door; (3) three men were seen crawling out of a tunnel adjacent to the apartment seconds after the police officer announced his presence; (4) the tunnel came from the apartment; (5) a large quantity of drugs and trafficking materials were openly displayed in the apartment; and (6) all four men were either found in, or had recently fled from, the apartment where the drugs and trafficking materials were openly displayed. Taken together, these facts were enough to establish probable cause to arrest the defendants for possession of a controlled substance with intent to deliver.

■ In arriving at this decision, I have been especially aware of the following principles: probable cause to arrest is assessed under the totality of the circumstances, *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir.1999); probable cause to arrest may be based upon the officers, collective knowledge, *United States v. Morgan,* 997 F.2d 433, 436 (8th Cir.1993); officers may make warrantless arrests when they possess information warranting a prudent person in believing the suspect has com-

mitted or was committing the offense, *United States v. Travis,* 993 F.2d 1316, 1323 (8th Cir.), *cert. denied,* 510 U.S. 883, 114 S.Ct. 229, 126 L.Ed.2d 184 (1993), 510 U.S. 889, 114 S.Ct. 245, 126 L.Ed.2d 198; and, while bare suspicion of criminal activity is insufficient, the police need not have enough evidence to justify a conviction before making a warrantless arrest. *United States v. Morales,* 923 F.2d 621, 624 (8th Cir.1991).

Therefore, having clarified that the way the police entered the apartment is irrelevant and that the police had probable cause to arrest all four men the moment the openly displayed drugs and trafficking materials were seen, I proceed further.

**B. From Start to Finish, the "Tunnel" Defendants Were Properly Detained Under *Terry* Principles.**

■ Initially, Judge Piester correctly determined that the three men in the tunnel were properly seized under *Terry* principles. *See Terry v. Ohio,* 392 U.S. 1, 28, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The act of creeping out of a dark hole in the wall, behind the back of a police officer, who has just announced his presence at the door of the adjacent apartment and who has just observed three pairs of legs scurrying away from the apartment door, coupled with complaints from the public about smelling drugs in the building, justifies a brief *Terry* stop.

Given the obvious danger to the police officer who was investigating a drug crime while standing alone in a dark hallway, the initial display of a gun and the use of handcuffs did not violate the *Terry* doctrine. *See, e.g., United States v. Navarrete–Barron,* 192 F.3d 786, 790–91 (8th Cir.1999) (handcuffing drug suspects did not violate *Terry* ); *United States v. McMurray,* 34 F.3d 1405, 1410 (8th Cir. 1994) (detaining a drug suspect at gun

point who was leaving a motel room did not violate *Terry* ), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995).

But Judge Piester also found that after additional police officers arrived, the detention became unlawful. According to the judge, since the police outnumbered the suspects, the detention was more intrusive than necessary. That is, the police unreasonably kept the men on the floor in handcuffs. I respectfully disagree with that later conclusion.[9]

Judge Piester believed that there was no longer any reason to keep the men in handcuffs after they exited the tunnel since they were unarmed, they were compliant, and there were more police officers present than there were suspects. Respectfully, the judge's decision overlooks important facts.

No one knew how many additional people might be in the dark tunnel. No one knew whether there was more than one tunnel.[10] Moreover, no one could know whether the unknown additional suspects might be armed. Given the fact that the investigation involved drugs, and drugs and guns are commonly associated, the officers had a real need to firmly control the three men as they searched the darkened tunnel for other potential threats to their safety. The number of police officers at the scene did nothing to ameliorate the reasonable fear of the unknown caused by the tunnel and the need to keep the three men firmly under control until the potential danger had been investigated.

In addition, the time between when the "tunnel defendants" were first detained and handcuffed and when they were for-

mally arrested was short. Elliott estimated that the time between when the men were handcuffed and when he entered the apartment was "[a]t the very most[,] three minutes." (Tr. 212.) The men were formally arrested immediately after Elliott and the officer who was in the tunnel entered the apartment and found the drugs. Thus, the fact that the defendants remained on the floor in handcuffs for the few short additional minutes it took to search the tunnel and enter the apartment does not make an otherwise valid *Terry* stop more intrusive than necessary.

Accordingly, I find and conclude that the detention of these men, from start to finish, was legal. Since the acquisition of probable cause immediately followed their brief and legal detention, the arrest of the "tunnel defendants" was proper.

## C. Even If the "Tunnel Defendants" Were Improperly Detained, Their Identification Would Not Be Subject to Suppression.

■ During the hearing, the prosecutor stated: "I'm not exactly clear what the defendants are actually trying to suppress." (Tr. 66.) Judge Piester inquired, and defense counsel responded, that they were intending to suppress the identification of the three men. (Tr. 67–82.) For three reasons, the identification of the men is not subject to suppression even if the detention was unlawful.

First, since the defendants were in plain sight crawling into a common area of the apartment when they were observed, McConnell had a right to look at the men. This is true whether he detained them or

---

9. However, because probable cause to arrest was not developed as a result of information learned from the detention of the three men, Judge Piester reasoned that their arrest, following the initial detention, should not be suppressed. Except for the finding that the

initial detention became more intrusive than necessary, I agree with Judge Piester.

10. As noted earlier, the police later found additional tunnels.

not. Just as McConnell had a right to look at a person who was walking down the street, McConnell had a right to look at the defendants as they crawled out of the tunnel adjacent to the apartment and into the common area. Therefore, even if the detention was unlawful from beginning to end, there is no basis to suppress McConnell's observation and identification of the three men.

Second, even if McConnell's observation of the men depended upon the detention and even if the initial detention turned sour because the men should not have been handcuffed during the entire incident, Judge Piester and I have both found that the initial part of the detention was justified under *Terry* principles. Thus, McConnell had a right to observe the men after he lawfully detained them. As a result, even if the detention subsequently became unlawful, there is no reason to suppress McConnell's prior identification of the three men.

Third, the Supreme Court has ruled that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1039–40, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (citations omitted). Thus, the defendants cannot suppress the police officers' observations of them even if the arrests were unlawful.[11]

Citing *United States v. Mendoza–Carrillo*, 107 F.Supp.2d 1098 (D.S.D.2000), Mr. Ramires argues that an improper arrest may lead to the suppression of statements and fingerprints which in turn result in an identification. But that argument is beside the point. There are no statements or fingerprints which allowed the police to identify the men as coming from the apartment. Here, the defendants seek to suppress McConnell's mere observation of the men, and *Lopez–Mendoza*, plainly read, forecloses that argument.

In short, even if the detention was somehow unlawful, McConnell was privileged to look at and identify the men by sight. Once the drugs were found shortly thereafter, probable cause existed to arrest these men. As a result, the alleged illegality of the *Terry* detention does not spoil the arrests.

### III. CONCLUSION

The defendants lacked any expectation of privacy in the apartment or its contents. Therefore, they have no right to suppress the discovery of the drugs or complain about how the police entered the apartment. Once the police found the drugs, there was probable cause to arrest all four men. Furthermore, the prior detention of the "tunnel" defendants was justified under *Terry* principles; that is, given the unknown danger posed by the tunnel and the drug investigation, holding the men on the floor in handcuffs for a short period of time was proper. And, even if the detention became illegal, the observation and identification of the men will not be suppressed either because the police had a right to observe them or because the Supreme Court has held that such identifications are not subject to suppression even if they follow an illegal arrest.

IT IS ORDERED that the objections to and appeal from Judge Piester's report and recommendation (filings 53, 54, 55, 56) are denied. It is further ordered that the motions to suppress (filings 27, 30, 31, 33

---

11. Regarding this third point, the same thing would hold true for Verde, the defendant found in the apartment. That is, even if his arrest was invalid, the observation of Verde standing near the table covered with drugs would not be subject to suppression under the *Lopez–Mendoza* doctrine.

RGK), as orally amended during the February 15, 2001, hearing, are denied. It is further ordered that the report and recommendation (filing 51) is adopted. It is further ordered that defendant Romel Verde's motion to adopt the co-defendants' briefs (filing 47) is granted.

## MEMORANDUM, REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

Defendants Romel Velarde, Fidel Chaidez, Oscar Ramirez, and Hector Chaidez filed motions to suppress, filings 27, 30, 31, and 33, respectively, asking this court to suppress the evidence found at 1022 West Koenig, Apartment 6, in Grand Island, Nebraska. On February 15, 2001 a hearing was held before me on these motions, and I concluded that the defendants had no standing to challenge the legality of the officers' entry and subsequent search of said apartment, and recommended that the motions be denied. *See* filings 40 and 41, Transcript of Hearing, pp. 42–45. Subsequently, during the same hearing the defendants asked the court for leave to amend their motions to contest the legality of their detentions and arrests. I granted their requests. Defendants argue that they were unlawfully arrested without probable cause. For the reasons set forth below, I shall recommend that the motions be denied also with respect to those claims.

## BACKGROUND

The evening of November 21, 2000, at approximately 9:00 p.m., Officers McConnell and Sayler of the Grand Island Police Department (GIPD) arrived at 1022 West Koenig in Grand Island, Nebraska, responding to anonymous calls that an odor of drugs was coming from a basement apartment on the east side of the building.[1] Upon their arrival, McConnell and Sayler stood at the top of a staircase leading to the basement apartment. There, they heard individuals engaged in conversation speaking the Spanish language and saw silhouettes through the partially covered door. The door was mostly made up of window panels and had a translucent curtain covering all but the lower eight inches. *See* Defendants' Exhibit 108. McConnell decided to go down the stairs and approach the door of the apartment. He looked under the curtain covering most of the door and saw three sets of legs. McConnell did not detect the odor of drugs from the apartment.

McConnell decided to knock on the door. A voice from inside the apartment asked who was knocking, and McConnell identified himself as a police officer. At that point, he saw the three sets of legs run inside the apartment. McConnell yelled several times for someone inside the apartment to open the door, but nobody answered. He then tried to open the door, but it was locked. McConnell called for assistance and talked to Sergeant Elliot to inform him of the situation. Afterwards, he tried to force open the door but was unsuccessful.

During his attempt to enter the apartment, McConnell heard a noise coming from an unlit room or common area behind him yet near the apartment. He turned around and shined his flashlight in that direction. There, McConnell saw a partial wall four to five feet high and an individual coming out towards him from a crawl space above it. *See* Defendants' Exhibits 116 and 117. He drew his weapon and told the individual to "freeze." Three other officers immediately came down to as-

---

1. McConnell stated that the calls indicated the odor came from apartment 7 in the building, but stated that having been in the build- ing before, he knew the basement apartment located on the east side of the building was apartment 6 and not apartment 7.

sist McConnell after they heard him yell. The officers eventually helped three individuals—Fidel and Oscar Chaidez and Ramirez—out of the crawl space. The suspects were directed to lie down on the concrete floor and were handcuffed behind their backs. They were not pat-searched. Sergeant Elliot and Officer Goodwin arrived about this time to assist in the detention.

Once the three individuals were out of the crawl space, Elliott asked them whether they lived in the apartment, and they responded "No." Elliott then proceeded to knock on the door and ordered the occupants to open it or he would force it open. Meanwhile, Goodwin volunteered to enter the crawl space for further investigation. Inside the crawl space, Goodwin testified, he was able to hear Elliott demand entry to the apartment. At the end of the crawl space Goodwin reached a "window" that went into an apartment he later determined to be Apartment 6. Someone inside the apartment eventually opened the door for Elliott. Elliott, with his gun drawn, ordered the two individuals inside to move away from the door and put their hands on their heads. Before entering the apartment, he observed what, based on his training and experience, appeared to be controlled substances on the front left corner of a table located in the kitchen immediately inside the apartment door. While McConnell handcuffed the two suspects inside the apartment, who were later identified as Velarde and Uriel Lopez,[2] Elliott walked directly to the kitchen and saw a white powdery substance, a scale, baggies, and other drug paraphernalia. He immediately ordered the officers to place the five suspects under arrest. By this time, Goodwin had found his way into the apartment through the hole connected to the crawl space. *See* Defendants' Exhibit 115.

2. Lopez is not a defendant in this case.

## DISCUSSION

### (1) DETENTION OF SUSPECTS OUTSIDE THE APARTMENT

Defendants Fidel Chaidez, Oscar Chaidez and Ramirez argue that their detention outside the apartment was in fact an unlawful arrest without probable cause. The government, on the other hand, argues that they merely detained the defendants for investigative purposes and for the officers' safety.

A police officer "may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Johnson*, 64 F.3d 1120, 1124 (8th Cir.1995) (quotations and citation omitted), *cert. denied*, 516 U.S. 1139, 116 S.Ct. 971, 133 L.Ed.2d 891 (1996). Such detention, however, "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Willis*, 967 F.2d 1220, 1224 (8th Cir.1992) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Also, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a *short* period of time." *Id.* (emphasis added). "Although '[t]here is no bright line of demarcation between investigative stops and arrests,' . . . a de facto arrest occurs when 'the officers' conduct is more intrusive than necessary for an investigative stop.' " *United States v. Bloomfield*, 40 F.3d 910, 916–17 (8th Cir.1994). To determine whether a de facto arrest has occurred such factors as the duration of a stop, whether the suspect was handcuffed or confined in a police car, whether the suspect was transported or isolated, and "the degree of fear and humiliation that the

police conduct engenders," are considered. *Id.* at 917.

Although it is a close question, I conclude that McConnell was justified in detaining the defendants given the circumstances present in this case. McConnell and Sayler were dispatched to the scene after a number of anonymous callers complained of the odor of drugs coming from an apartment. The officers approached the target apartment, heard people speaking in Spanish, and looked under a curtain covering the main door and observed three sets of feet. Nothing seemed suspicious up to that point, since the officers were not able to detect the odor of drugs. So too, when McConnell knocked on the door and the occupants remained in the immediate area and he was asked, "Who is it?," there was nothing suspicious. However, when McConnell identified himself as a police officer, he saw that the three sets of feet that he had observed earlier began to run in every direction within the apartment. He yelled to the people inside to open the door and nobody answered. Within a couple of minutes he heard a noise behind him coming from the common area adjacent to the apartment, and by using his flashlight he discovered an individual coming from the top of a half-wall leading to a crawl space.

The act of flight "is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *See Illinois v. Wardlow,* 528 U.S. 119, 121, 120 S.Ct. 673, 675 145 L.Ed.2d 570 (2000). In *Wardlow* the Supreme Court ultimately held that based on the totality of the circumstances, which included the high-crime character of the neighborhood and the defendant's "unprovoked flight upon noticing the police," a police officer was "justified in suspecting that [the defendant] was involved in crimi-

nal activity, and therefore, in investigating further." *Id.* at 676.

In this case there is no evidence that these events occurred in a high-crime area,[3] but I conclude the situation was "ambiguous" enough that McConnell was justified in detaining the defendants to resolve the incongruencies he had encountered. McConnell not only saw the three sets of feet run when he announced himself, but almost immediately thereafter he discovered an individual trying to come out through a hole in the wall behind him. Running from the police would probably not be sufficient to detain a person for investigation absent other circumstances. However, running from the policeman at the door and taking the effort of exiting an apartment through a dark and filthy crawl space would certainly raise a reasonable suspicion of wrongdoing. Even though McConnell did not have suspicion of drug use, which was the reason they were originally summoned to that address, it was reasonable for him to think, as he testified, that other criminal activity, such as a burglary, might be taking place. Thus, I conclude McConnell had a reasonable suspicion that criminal activity was afoot. *See United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir.1994) ("A trained officer may properly infer from a collection of circumstances, no one of which itself indicates illegal activity that further inquiry is appropriate.").

Even though McConnell was justified in detaining the defendants, I conclude he did not employ the "least intrusive" methods available to eliminate his suspicions. Courts have agreed that certain investigative methods are so coercive and cause such fear and humiliation that they may contribute to a finding of arrest. In a number of cases, the Eighth Circuit has

**3.** McConnell did testify he knew the house from "previous calls," but there was no testi-

mony which would support a conclusion that it was a "high crime" location.

held that the use of handcuffs and firearms was justified during a lawful investigative detention, but only in situations involving potential danger. In *United States v. McMurray*, 34 F.3d 1405 (8th Cir.1994), for instance, the court held that officers conducting an investigative detention were justified in drawing their weapons because they had reasonable articulable suspicion that suspects were involved in drug dealing, a situation frequently involving weapons and potential danger to the officers. *Id.* at 1410–11. In that case the officers knew before the detention that suspects staying at a motel came from drug source cities, checked in on the same day, paid cash, renewed rooms one day at a time, refused maid service, received numerous incoming calls, hired a taxi to an area known for open-air crack dealing, and exited quickly by a back door when an officer knocked on the front door. *Id.* at 1409–10. Also, in *United States v. Lloyd*, 36 F.3d 761 (8th Cir.1994), the Eighth Circuit held that officers were justified in drawing their guns upon encountering a suspect in an apartment building where they were investigating claims by a person that he had been threatened with his life by persons carrying firearms. *Id.* at 763. Similarly, the court held in *United States v. Miller*, 974 F.2d 953 (8th Cir.1992), that the handcuffing of suspects during a lawful investigative stop did not convert the stop into an unlawful arrest because the suspects outnumbered the officers by six to three and the defendant was suspected of engaging in drug trafficking, which created a concern that some of the suspects might be armed. *Id.* at 957.

In contrast, the Tenth Circuit held in *United States v. Melendez–Garcia*, 28 F.3d 1046 (10th Cir.1994), that the combination of officers' display of their guns and use of handcuffs on suspected drug dealers effectively turned a detention into an arrest where there was no evidence of potential danger. *Id.* at 1052–53. The facts in that case showed that a confidential informant informed DEA agents that individuals were going to transport marijuana from the Las Cruces, New Mexico area to California in a "white T-bird-type vehicle." The officers were informed that the individuals would travel to Deming, New Mexico on Interstate 10 to pick up the drugs and continue on their way to California. *Id.* at 1049. The Border Patrol later informed the officers that a white Cougar had passed by their checkpoint on Interstate 10 on its way to Deming. Officers traveled to Deming and located the car parked at a motel. There they observed some activity and eventually saw individuals drive away in the white Cougar and a brown Dodge. Believing the cars were heading to California, the officers decided to stop the two cars. Once the stops were effected, the officers pointed their weapons at the vehicles, ordered the occupants to throw out their keys and put their hands out, and then told them to get out of the cars one at a time and walk backwards towards them. The individuals were handcuffed, frisked, and placed in separate vehicles. *Id.* The Tenth Circuit recognized that the vehicles were stopped based on suspicions of drug trafficking, and that drug trafficking often means potential danger. *Id.* at 1052. The court found, however, that there was no evidence that the police had reason to believe the suspects were armed, were violent, or that the circumstances required the "unusual intrusiveness" of handcuffing the suspects, and concluded that "the naked fact that drugs are suspected [would] not support a per se justification for use of guns and handcuffs in a Terry stop." *Id.* at 1052–53.

McConnell was justified in drawing his gun when he first discovered the suspects trying to exit the crawl space. The place was dark, and he did not initially know how many individuals there were in the space and whether they were armed.

However, I find there was no necessity in these circumstances for also handcuffing the defendants. The evidence shows that once McConnell yelled to order the defendants out of the crawl space, at least three other officers immediately came down to the basement to assist him and a few more came minutes later. At least one of these additional officers also had his gun drawn and pointed at the defendants as they were being assisted out of the crawl space by other officers. Goodwin also testified that as the officers helped the defendants out of the crawl space, they came out head first and the officers could see their hands. Further, when the defendants were ordered to lie face down on the concrete floor they readily complied and did not take any actions that indicated a reasonable probability of danger to the officers or the potential for flight.

This is an extremely close question, and these circumstances readily lend themselves to $^{20}\!/_{20}$ hindsight from a calm analytical perspective months later. I have carefully analyzed the objective facts present, as well as the officers' reasonable, trained inferences, from the perspective of an officer on the scene as it quickly unfolded. While it was certainly reasonable for McConnell to believe there was a very real potential for danger while he was the only officer confronting an unknown number of possibly armed people coming toward him in the dark in suspicious circumstances, I conclude that when the threat of danger was dispelled—that is, once there were more officers on the scene than suspects, there were more flashlights lighting the scene, and it was learned that the defendants were compliant and none was armed—the "reasonableness" of that belief was correspondingly diminished. Even if I were to conclude that the initial cuffing was reasonable, the continued forceful keeping of the suspects cuffed on the floor was "more intrusive than necessary," after the fear of danger was dispelled. Thus, I

conclude the three defendants were unlawfully arrested.

However, concluding that the defendants' initial arrest was unlawful is not the end of the matter. Some minutes after the three defendants were taken out of the crawl space, put on the floor, and handcuffed, the officers independently obtained probable cause to arrest the defendants.

The Supreme Court has set out three factors that courts must consider in determining whether the taint of an illegal action has been purged: (1)the temporal proximity of the illegal action, (2) whether there are any intervening circumstances, and (3) "the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603–604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The ultimate purpose in considering these factors is to determine whether any evidence or information was obtained by the police through the "exploitation of an illegal arrest...." *Id.*

A number of courts have held that the development of probable cause independent from an illegal arrest serves to attenuate the taint of the initial illegal arrest. *See United States v. Ibarra–Sanchez*, 199 F.3d 753, 761–62 (5th Cir.1999) (holding that even if officers unlawfully arrested the defendants, the drugs found in the defendant's vehicle and the statements defendants made after their official arrest should not be suppressed because contemporaneous to the unlawful arrest, the officers independently developed probable cause to first search the defendant's vehicle, and then to lawfully arrest and interrogate the defendants); *United States v. Edwards*, 103 F.3d 90, 94 (10th Cir.1996) (holding that the intervention of a valid arrest prior to a defendant's attempt to make a deal with the police, purged the taint of defendant's initial illegal arrest because the defendant's attempt to make a deal was not caused by any exploitation of

unlawful arrest); *United States v. Cherry,* 794 F.2d 201, 206 (5th Cir.1986) (finding that a defendant's consent to search his barracks cubicle was sufficiently free of any taint arising from his illegal arrest in part because during the time the defendant was in custody officers independently acquired evidence that gave them probable cause to continue defendant's detention); *United States v. Manuel,* 706 F.2d 908, 911–12 (9th Cir.1983) (holding that defendant's confession given one day after arrest was not tainted by his illegal arrest where shortly after such arrest the police accumulated enough evidence to establish probable cause, the confession was not obtained by exploitation of illegality of arrest, defendant's statements were voluntary, considerable period of time elapsed between arrest and interrogation, and police conduct was not flagrant or designed to pressure defendant into giving unfair confession).

In this case after the defendants were unlawfully arrested, Sergeant Elliott ordered the remaining occupants of the apartment to open the door, which they did shortly thereafter. Once the door was open, Elliott testified, he was able to see, even before entering the apartment, what appeared to be controlled substances on the front left corner of a table located in the kitchen. In addition, Goodwin had discovered by this time that the crawl space led into the· apartment, giving the officers reason to believe that the defendants were involved in drug packaging activities inside the apartment and probable cause to lawfully arrest them. Because I have concluded that the defendants did not have a reasonable expectation of privacy inside the apartment, such probable cause would have been developed regardless of the unlawful arrest. Therefore, I conclude probable cause was developed independently and not through the exploitation of the initial arrest, and the defendants' formal arrests were lawful.[4]

### (2) DETENTION OF SUSPECT INSIDE THE APARTMENT

Defendant Velarde also argues that he was unlawfully arrested inside the apartment without probable cause. I disagree.

■ The facts show that after Velarde opened the door of the apartment, Elliott saw from the outside what he thought

---

**4.** Although I have concluded that probable cause to arrest the defendants was developed independently from the initial arrest, I must note that I disagree with the government's argument that exigent circumstances justified the warrantless entry into the apartment. Exigent circumstances justifying a warrantless entry into a dwelling include the hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the imminent threat to the life or safety of the officers or to other persons inside or outside the dwelling. *See Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990). The government argues that there were exigent circumstances in this case because the officers were summoned to the apartment building because an odor of drugs had been detected, because the occupants of the apartment ran when McConnell announced himself, and because McConnell discovered three of the defendants

trying to escape through a crawl space. I disagree. First, McConnell stated that when he was standing outside the apartment he did not smell any drugs. Secondly, while I concluded that the conduct of the defendants in running and trying to escape through the crawl space provided McConnell with reasonable suspicion for an investigatory detention, those facts do not provide exigent circumstances to justify a warrantless entry. The officers were clearly not pursuing a fleeing felon and they did not know whether there were in fact any drugs in the apartment that could be destroyed. Also, even though McConnell testified that he suspected a burglary could be in progress, the officers did not have any evidence indicating that there was imminent threat to their own lives or the lives of persons inside the apartment or that they could not have prevented the suspect's escape by securing the building until they obtained a warrant to enter the apartment.

were controlled substances. Although the mere presence of a person at the scene of a crime does not establish probable cause for an arrest, such fact along with other information may justify a warrantless arrest if the totality of the circumstances indicate that a crime has been or is being committed. *See United States v. Holder*, 990 F.2d 1327,(D.C.Cir.1993) (holding that there was probable cause to arrest a defendant found standing just a few feet away from a table full of cocaine inside a private apartment because the open display of the drugs in defendant's presence reflected his knowledge and potential involvement in drug activity, or at least that the owner of the drugs considered him "sufficiently complicit to allow him a full view of the drug distribution scene"); *United States v. Houston*, 892 F.2d 696, 702 (8th Cir.1989) (Police had probable cause for warrantless arrest of defendant because he was in a house containing evidence of narcotics activity at the time a search warrant was executed, officers recovered cocaine and weapons in a sufficient quantity to believe that defendant had committed or was committing an offense, seized $835 in defendant's clothing, and an informant had stated to them that he had observed cocaine cooked into "crack" by the defendant and others at the searched premises); *cf. United States v. Miller*, 546 F.2d 251, 253 (8th Cir.1976) (because police officers had no other information about the defendant except for his statement that he was just visiting a girl, they did not have probable cause to arrest

him despite the fact they found narcotics in a refrigerator located in the kitchen of an apartment they were lawfully searching and defendant was seated at a table in the same room).

■ In this case Velarde was found standing inside a private apartment a few feet from a table with drugs in plain view. Velarde's proximity to the openly displayed drugs reflected, as in *Holder*, his possible involvement in drug activity. This probability is reinforced by the fact that all the occupants of the apartment ran when McConnell identified himself as a police officer and did not answer the officers' calls to open the door until some minutes later. Although it is possible that Velarde, and the other defendants for that matter, were just innocent visitors as they claim, their presence in the apartment with the drugs out in the open created a "fair probability" that they were involved in criminal activities. *See Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) (probable cause exists if "at the moment the arrest was made ... the facts and circumstances within [a police officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the person arrested committed the crime with which he was charged). Therefore, I conclude Elliott had probable cause to arrest Velarde before entering the apartment and before any officer handcuffed the defendant.[5]

**5.** It is worth noting that although Velarde opened the door only in compliance with Elliott's demands, that is of no significance in this case. A number of circuits have held that compliance to a show of authority may give raise to unconstitutional searches and seizures. For instance, the Eighth Circuit held in *United States v. Conner*, 127 F.3d 663 (8th Cir.1997) that an unconstitutional search occurred when officers gained visual or physical access to a motel room after the occupant

opened the door not voluntarily, but in response to a demand under color of authority. *Id.* at 666. In somewhat similar circumstances, the Seventh Circuit held in *United States v. Jerez*, 108 F.3d 684 (7th Cir.1997) that defendants were unlawfully seized where they were forced to open their motel room door to comply with persistent demands from the police. *Id.* at 692. This case, however, differs from those cases in one important respect: unlike the defendants in *Conner* and

**IT THEREFORE HEREBY IS REC-OMMENDED** to the to the Honorable Richard G Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that defendants' motions to suppress as amended during the February 15, 2001 hearing be denied.

The parties are notified that unless objection is made within ten days after being served with a copy of this, recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

**FURTHER, IT HEREBY IS ORDERED,** trial of this matter is set to begin at 9:00 AM on May 21, 2001, or as soon thereafter as the case may be called, with jury selection at the commencement of trial. Trial is scheduled for 5 trial days. March 15, 2001.

*Jerez,* Velarde did not have a reasonable expectation of privacy in the apartment. *See* filings 40 and 41, Transcript of Hearing, pp. 42–45. Thus, Velarde has no basis to contest the entry into the apartment and the discovery of the evidence that ultimately led to his arrest.